# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| **LEAH A. NADEAU,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **EP-12-CV-433-KC** |
| | § | |
| **ECHOSTAR; ECHOSPHERE L.L.C.;** | § | |
| **and DISH NETWORK L.L.C.,** | § | |
| | § | |
| **Defendants**. | § | |

## <u>ORDER</u>

On this day, the Court considered (1) Defendants' Motion for Summary Judgment (the "Summary Judgment Motion"), ECF No. 20; (2) Defendants' Motion to Strike Portions of the Affidavit of Leah Nadeau (the "Motion to Strike"), ECF No. 30; and (3) Plaintiff's First Amended Motion for Sanctions for Violation of Local Rule CV-88(b) and (d) With Regard to Mediation (the "Motion for Sanctions"), ECF No. 34, in the above-captioned case (the "Case"). For the reasons set forth below, the Summary Judgment Motion is **GRANTED**. The Motion to Strike is **DENIED** as moot; the Court, even considering Plaintiff's Affidavit in its entirety, grants summary judgment to Defendants on all claims, so the Court need not assess whether certain portions of the affidavit are not properly part of the summary judgment record. *See Hernandez v. Napolitano*, No. EP-10-CV-480-KC, 2012 WL 641033, at *1 (W.D. Tex. Feb. 27, 2012) (Cardone, J.). The Motion for Sanctions is **DENIED**.

## I.   BACKGROUND

### A.   Procedural History

On or about September 24, 2012, Plaintiff filed suit against Defendants in the 168th

Judicial District Court of El Paso County, Texas. Notice of Removal, ECF No. 1, 1 (the "Notice of Removal"). Defendants removed the Case to this Court on October 29, 2012. *Id*. at 1. Plaintiff had previously filed a petition against Defendants in state court on January 28, 2011, and an amended petition in August 2011, but Plaintiff never served or attempted to serve either of these petitions on Defendants. Pl.'s Resp. to Proposed Undisputed Facts ¶¶ 21-23; Defs.' Proposed Undisputed Facts ¶¶ 21-23; Pl.'s Counsel's Aff. ¶4.

Plaintiff, with the Court's leave, filed her Third Amended Complaint (the "Amended Complaint") on January 2, 2013. ECF No. 11. The Amended Complaint alleges claims under the Americans With Disabilities Act of 1990 (the "ADA") and the Age Discrimination in Employment Act (the "ADEA"), as well as common-law causes of action for negligent supervision and intentional infliction of emotional distress. Pl.'s Am. Compl. ¶¶ 1-2.

On January 23, 2013, Defendants filed their Answer, ECF No. 15, as well as Defendants' Partial Motion to Dismiss for Failure to State a Claim (the "Partial Motion to Dismiss"), ECF No. 16. The Court granted the Partial Motion to Dismiss on April 19, 2013, thereby dismissing Plaintiff's claims for negligent supervision and intentional infliction of emotional distress. Order, ECF No. 17. As a result, the claims currently remaining in the Case are Plaintiff's statutory claims for employment discrimination, retaliation, wrongful termination, and hostile work environment[1] under the ADA and ADEA. *See* Pl.'s Am. Compl. ¶ 1.

Defendants filed the Summary Judgment Motion, which requests summary judgment in Defendants' favor on each of these remaining claims, on July 22, 2013. Summ. J. Mot. 1. Attached to the Summary Judgment Motion are Defendants' Proposed Undisputed Facts, ECF

---

[1] As the Court explains below, although Plaintiff does not explicitly list a hostile work environment claim, the Court construes the Amended Complaint to include one.

No. 20-1, a declaration by Defendants' human resources manager Yvette Delgado (the "Delgado Declaration"), ECF No. 20-2, various exhibits ("Defendants' Exhibits"), ECF No. 20-2, and excerpts of Plaintiff's deposition testimony ("Plaintiff's Deposition"), ECF No. 20-2.

Plaintiff filed a response to the Summary Judgment Motion ("Plaintiff's Response") on August 20, 2013.[2] ECF No. 28. Attached to the Response is an affidavit from Plaintiff ("Plaintiff's Affidavit"), ECF No. 28-1, and Plaintiff's Response to Proposed Undisputed Facts, ECF No. 28. On August 22, 2013, Defendants filed a reply to the Response ("Defendants' Reply"). ECF No. 29. On the same day, Defendants also filed the Motion to Strike, which seeks to strike portions of the Affidavit from the summary judgment record. Mot. to Strike 1-9.

On September 25, 2013, Plaintiff filed the Motion for Sanctions, alleging that Defendants and their counsel violated Federal Rule of Civil Procedure 16(f) and Local Rule CV-88 by arriving at a mandatory mediation without settlement authority or an intention to negotiate in good faith. Mot. for Sanctions 1-5. Defendants applied to file their Response to the Motion for Sanctions under seal on October 2, 2013. ECF No. 35. The Court granted that application on October 3, 2013. Defendants then accordingly filed under seal Defendants' Response to Plaintiff's Motion for Sanctions, ECF No. 36.

### B.    Factual Background

The Court here recounts the facts relevant to its disposition of the Summary Judgment Motion. As is appropriate on summary judgment, where the parties have submitted evidence of contradictory facts, the Court resolves factual controversies in favor of the nonmovant. *See*, *e.g.*, *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) ("*Liquid Air*").

---

[2] Plaintiff initially filed a response to the Summary Judgment Motion on August 10, 2013, ECF No. 22, but the Court struck this pleading for failure to comply with the Court's standing orders. Order, ECF No. 24.

Defendants are satellite television providers. Pl.'s Am. Compl. ¶¶ 4-6, 8-10, 12-13. Plaintiff began working for Defendants at their call center as a customer service representative around 1999 or 2000. Pl.'s Aff. ¶ 2; Pl.'s Dep. 14; Defs.' Answer ¶ 4; Defs.' Proposed Undisputed Facts ¶ 1; Pl.'s Resp. to Proposed Undisputed Facts ¶ 1. A few years thereafter, Defendants promoted Plaintiff to a coach position with supervisory duties. Defs.' Proposed Undisputed Facts ¶ 1; Pl.'s Resp. to Proposed Undisputed Facts ¶ 1; Defs.' Ex. 1. At the time of the events relevant to the Case, Plaintiff was one of Defendants' oldest employees. Pl.'s Resp. ¶ 2; Pl.'s Aff. ¶ 4. Some years prior to the events at issue in the Case, Plaintiff suffered from chronic anxiety problems, and had previously requested and received medical leave from Defendants pursuant to the Family and Medical Leave Act, 29 U.S.C. §§ 2601-54 ("FMLA"). Defs.' Proposed Undisputed Facts ¶ 2; Pl.'s Resp. to Proposed Undisputed Facts ¶ 2; Defs.' Ex. 2-3.

In July 2009, at the age of 49, Plaintiff was diagnosed with diverticulitis, a digestive disease correlated with advanced age. Pl.'s Resp. ¶ 2; Pl.'s Aff. ¶ 3. Plaintiff was hospitalized and missed work for a week. Pl.'s Aff. ¶ 3. It appears Defendants excused this absence as medical leave under the FMLA. *Id.* ¶ 13.

One symptom of Plaintiff's diverticulitis was the need to use the restroom more often than other employees, and more often than was permitted under Defendants' company policy. *Id.* ¶¶ 4-5. As a result, when Plaintiff returned to work in July 2009, she requested an exception to Defendants' restroom use policy (the "First Accommodation Request"). *Id.* ¶ 5. Defendants granted this exception. Pl.'s Dep. 118, 120.

After Plaintiff left the hospital and made the First Accommodation Request, her relationships with her co-workers and supervisors soured. Other employees began ignoring

Plaintiff while greeting other employees in a more welcoming and friendly manner. Pl.'s Aff. ¶¶ 6, 11. On one occasion, one of Plaintiff's managers, Rafael Zamudio[3] ("Zamudio"), tauntingly chanted "Leah looking sick" at Plaintiff in front of her fellow employees. *Id*. ¶¶ 6, 24. Some employees put documents in folders rather than handing directly them to Plaintiff, or directed Plaintiff to set documents for review on her supervisor's desk instead of handing them directly to the supervisor. *Id*. ¶¶ 6, 9-10. Plaintiff suspects that these employees secretly and erroneously believed that her diverticulitis was contagious and therefore sought to avoid physical contact with her, although Plaintiff presents no evidence that would substantiate this suspicion beyond her own subjective belief. *See id*.

Plaintiff was hospitalized a second time in October 2009 to undergo a painful and disabling procedure related to her diverticulitis. *Id*. ¶ 7. Plaintiff does not state how much work she missed during her second hospitalization. *See id*. Plaintiff alleges that when she returned to work after the second hospitalization, her co-workers treated her even more unpleasantly than before. *Id*.

In January 2010, Defendants assigned Plaintiff the duty to supervise the worst-performing employees, instead of the high-performing employees she had previously supervised. *Id*. ¶ 8. Defendants also switched Plaintiff's assignments every two weeks, such that Plaintiff was regularly required to learn a new position. *Id*. Defendants also gave Plaintiff a less desirable night shift. *Id*. ¶¶ 8, 10. Various employees of Defendants, including managerial employees, continued to treat Plaintiff rudely during this time period. *See id*. ¶ 24. These circumstances made it difficult for Plaintiff to maintain her previous level of performance. *Id*. ¶ 8.

---

[3] Plaintiff, on several occasions, appears to erroneously refer to Zamudio as "Ralph Zumbia" or "Ralph Zamudio." *See* Pl.'s Aff. ¶¶ 24-26; Pl.'s Dep. 60. The Court assumes that Plaintiff intends to refer to the same person throughout.

On March 24, 2010, Plaintiff attended a meeting with her co-workers and a manager named Jorge Najera ("Najera"). At this meeting, Najera, in front of Plaintiff and her co-workers, said "the job is not for you if you have a health problem, you will still get demoted and you could still loose [sic] your job." *Id.* ¶ 24. Najera stared directly at Plaintiff while making this statement. *Id.* Najera further "stated he did not care because he had a college degree." *Id.* Najera knew at the time he made this statement that Plaintiff suffered from health problems. *Id.*

Sometime before April 15, 2010, Plaintiff learned that some employees at the El Paso location would soon be demoted. Pl.'s Dep. 65, 141. Plaintiff admits that Defendants formulated the demotion criteria and made the decision to demote these employees prior to April 15, 2010; it appears Defendants finalized the criteria on April 9, 2010 or shortly thereafter. *Id.* at 141; Defs.' Ex. 4. An internal e-mail from Zamudio to other managers sent on April 9, 2010, reflects that Defendants planned to assess each employee on the basis of their performance and leadership scores and demote the five lowest-scoring employees. Defs.' Ex. 4. Defendants would then notify each demoted employee individually during a meeting with a manager and a representative from the human resources department. *Id.* While there is evidence that Zamudio played a major role in developing and implementing these criteria, there is no comparable evidence that Najera exercised any control whatsoever over the demotion decisions or criteria. *See id.* Prior to April 15, 2010, Plaintiff did not believe she was among the employees at risk for demotion. Pl.'s Dep. 65, 141; Pl.'s Aff. ¶ 8.

On April 15, 2010, Plaintiff informed her manager she needed to leave work early to attend a doctor's appointment. Pl.'s Aff. ¶ 9. Rather than permitting Plaintiff to leave for her

appointment, Defendants sent Plaintiff to meet with several of her managers.[4] *Id*. ¶¶ 9, 25. Plaintiff consequently missed her doctor's appointment. *Id*. ¶¶ 9, 13. At this meeting, Defendants informed Plaintiff that Defendants were demoting her to a Customer Service Specialist III ("CSS III") position (the "First Demotion") and denying her a pay raise. *Id*. ¶ 9; Defs.' Proposed Undisputed Facts ¶ 6; Pl.'s Resp. to Proposed Undisputed Facts ¶ 6. Plaintiff offers contradictory evidence regarding whether Defendants ever gave her a reason for the First Demotion, but Defendants either provided no reason at all or told her that her work performance for the previous three months was unsatisfactory. *Compare* Pl.'s Aff. ¶ 9, *with id*. ¶ 25, *and* Pl.'s Dep. 58. Defendants demoted several other employees on the same day. Defs.' Proposed Undisputed Facts ¶ 3; Pl.'s Resp. to Proposed Undisputed Facts ¶ 3; Pl.'s Dep. 57-58. However, Plaintiff asserts that Defendants did not demote younger employees who did not suffer from debilitating medical conditions, notwithstanding that these employees also obtained low performance scores. Pl.'s Aff. ¶ 14, 25.

On May 13, 2010, Plaintiff took steps to lodge a charge of discrimination against Defendants with the Department of Labor (the "Department"). Pl.'s Aff. ¶ 12. Plaintiff makes contradictory assertions regarding whether she in fact ultimately filed this charge. *Compare id*. ¶ 12 ("Ultimately, I did not actually file the charge of discrimination with the [Department]), *and* Pl.'s Dep. 142 ("Q. So you didn't actually file anything with the [Department]? A. No."), *with* Pl.'s Aff. ¶ 13 ("I then filed a charge with the [Department]"). The Court assumes that, at the very least, Plaintiff made some sort of initial contact with the Department. Plaintiff admits that Defendants had no knowledge that she had contacted the Department. *See* Pl.'s Dep. 142; Pl.'s

---

[4] Plaintiff offers multiple inconsistent lists of which of Defendants' personnel were present at this meeting. *See* Pl.'s Aff. ¶¶ 9, 25; Pl.'s Dep. 45. *See also* Delgado Decl. ¶ 5.

Aff. ¶ 12.

After Plaintiff filed the charge with the Department or considered doing so, her managers continued to treat her coldly. Pl.'s Aff. ¶¶ 12, 26. Plaintiff, tired of being ignored by her fellow employees, sought mental health treatment from Cecilia B. Garcia ("Garcia").[5] *Id*. ¶ 12; Defs.' Proposed Undisputed Facts ¶ 9; Pl.'s Resp. to Proposed Undisputed Facts ¶ 9. Garcia diagnosed Plaintiff with major depressive episodes, post-traumatic stress disorder, ADHD, marital problems, and work-related stress, and prescribed medication accordingly. Pl.'s Aff. ¶ 12; Defs.' Ex. 5. Plaintiff asserts that these mental health problems stem solely from Defendants' treatment of her, Pl.'s Aff. ¶ 12, but Plaintiff also admits that she suffered from debilitating chronic anxiety even prior to the events of the Case. Defs.' Proposed Undisputed Facts ¶ 2; Pl.'s Resp. to Proposed Undisputed Facts ¶ 2; Defs.' Ex. 2-3. The Court therefore assumes that although Defendants' actions were not the initial cause of Plaintiff's mental health issues, they did exacerbate them. Plaintiff continued to suffer from diverticulitis in addition to her mental illnesses. Pl.'s Aff. ¶ 12.

On or about May 15, 2010, Plaintiff requested a further exception from Defendants' restroom use policy for her diverticulitis (the "Second Accommodation Request"). *Id*. ¶ 13. It is unclear how the terms of the Second Accommodation Request differed from those of the First Accommodation Request. *Compare id*. ¶ 13, *with id*. ¶ 5. In any event, Defendants allowed Plaintiff to take additional restroom breaks. Defs.' Proposed Undisputed Facts ¶ 5; Pl.'s Resp. to Proposed Undisputed Facts ¶ 5; Pl.'s Dep. 72-73, 118, 120. However, Defendants required

---

[5] As discussed above, Plaintiff had previously received psychiatric treatment from mental health providers other than Garcia. *See* Def's Ex. 2-3. Plaintiff does not specify the exact date she began seeing Garcia for treatment. *See* Pl.'s Aff. ¶ 12.

Plaintiff to advise her co-workers when she needed to use the restroom.[6] Pl.'s Aff. ¶¶ 13, 27; Pl.'s Dep. 142. When Plaintiff did so, she received dirty looks. Pl.'s Aff. ¶ 13; Pl.'s Dep. 142. On one occasion, a supervisor exclaimed "You're in training!" when Plaintiff requested a restroom break, although Plaintiff does not allege that this supervisor prevented her from using the restroom on this occasion. *See* Pl.'s Aff. ¶ 13. Plaintiff asserts that she was the only employee required to announce her restroom visits, although Plaintiff could not name other employees with similar health conditions who requested comparable exemptions from Defendants' restroom use policy. *See id.* ¶ 27; Pl.'s Dep. 27.

On June 7, 2010, Plaintiff filed a complaint against Defendants with the Equal Employment Opportunity Commission ("EEOC") for retaliation, age discrimination, and disability discrimination (the "First EEOC Complaint"), alleging the facts outlined above. Pl.'s Aff. ¶ 13. Plaintiff received a right to sue letter from the EEOC in response to the First EEOC Complaint on October 30, 2010. *Id.* ¶ 43.

Plaintiff states that Defendants' employees took further undesirable actions toward her on various occasions between June 2010 and November 2010. According to Plaintiff, sometime in June 2010 Defendants told Plaintiff to release a call that was on hold for more than two minutes, which affected Plaintiff's performance rating score. *Id.* ¶ 28. On or about September 4, 2010, Defendants gave Plaintiff an incorrect performance rating and placed her on a non-preferred night shift on that basis.[7] *Id.* ¶ 29.

---

[6] Although Defendants initially considered requiring Plaintiff to log her additional restroom visits on a spreadsheet, Plaintiff conceded in her deposition that "this spreadsheet . . . wasn't ever actually created or implemented." Pl.'s Dep. 25.

[7] It is not clear from the record how Defendants could have placed Plaintiff on a night shift on September 4, 2010, if, as discussed above, they already placed her on a night shift in January 2010. *Compare* Pl.'s Aff. ¶ 29, *with id.* ¶ 8. While Plaintiff's Affidavit is ambiguous, it appears that Defendants may have temporarily switched Plaintiff back to a morning shift sometime in

In November 2010, Defendants denied Plaintiff intermittent FMLA leave even though she provided Defendants with the medical documentation they requested.[8] *Id.* ¶ 30; Pl.'s Resp. to Proposed Undisputed Facts ¶ 2. Plaintiff alleges almost no factual matter further describing the circumstances surrounding this leave denial. *See* Pl.'s Aff. ¶ 30; Pl.'s Resp. to Proposed Undisputed Facts ¶ 2.

Also in November 2010, Plaintiff applied for an on-the-job trainer ("OJT") position with Defendants. Pl.'s Aff. ¶ 15; Defs.' Proposed Undisputed Facts ¶ 6; Pl.'s Resp. to Proposed Undisputed Facts ¶ 6. Defendants gave Plaintiff the OJT position after she interviewed and qualified for the position. Pl.'s Aff. ¶ 15; Defs.' Proposed Undisputed Facts ¶ 2; Pl.'s Resp. to Proposed Undisputed Facts ¶ 2.

On or about January 26, 2011, Defendants called Plaintiff into their human resources office to sign an arbitration agreement. Pl.'s Aff. ¶ 32. Plaintiff does not specify what the subject of this arbitration agreement was. *See id.* In particular, Plaintiff does not specifically allege that the arbitration agreement related to the First EEOC Complaint, or to her dealings with the Department, or to anything else involving the events of the Case. *See id.* Plaintiff vaguely alleges that Defendants "w[ere] aware that [she] had a legal matter pending," but does not identify what that legal matter was or how Defendants were aware of it. *See id.* Nor does Plaintiff allege that Defendants threatened her with any adverse consequences if she refused to consent to arbitration. *See id.*

---

between these two dates. *See id.* ¶ 8. The Court assumes that Defendants gave Plaintiff an undesirable shift on two separate occasions.

[8] *But see* Pl.'s Dep. 116 ("Q. You never had FMLA leave denied, did you? A. Not that I can recall. I'm thinking there may have been, but not that I can recall."). The Court assumes that Defendants denied Plaintiff intermittent FMLA leave in November 2010, but Plaintiff's memory of this event lapsed at her deposition.

Plaintiff passed a certification test in February 2011 with a score of 87%. *Id.* ¶ 34. However, in March 2011, Defendants required Plaintiff to retake the certification test and pass with a 90%. *Id.* Also in March 2011, Defendants did not pay Plaintiff for jury duty even though Plaintiff requested personal leave pay. *Id.* ¶ 33.

On May 11, 2011, Plaintiff filed a second charge of discrimination against Defendants with the EEOC (the "Second EEOC Complaint"). Defs.' Proposed Undisputed Facts ¶ 22; Pl.'s Resp. to Proposed Undisputed Facts ¶ 22. The EEOC mailed Plaintiff a right to sue letter dated May 20, 2011, although it is unclear when Plaintiff actually received this letter. Defs.' Ex. 15; Defs.' Proposed Undisputed Facts ¶ 22; Pl.'s Resp. to Proposed Undisputed Facts ¶ 22.

In March 2012, nearly a year and a half after Defendants gave Plaintiff the OJT position, Defendants added new supervisory duties to the position. Pl.'s Aff. ¶ 16; Defs.' Proposed Undisputed Facts ¶ 7; Pl.'s Resp. to Proposed Undisputed Facts ¶ 7. Plaintiff admits these new duties were essential functions of the OJT position as newly constituted. Defs.' Proposed Undisputed Facts ¶ 9; Pl.'s Resp. to Proposed Undisputed Facts ¶ 9. Plaintiff, due to her mental health issues, had difficulty coping with the position's new responsibilities. *See* Pl.'s Aff. ¶ 16.

In May 2012, Plaintiff did not receive a report card regarding her on-the-job duties, even though all of her co-workers did. *Id.* ¶ 36. Also in May 2012, Plaintiff received an instant message of unidentified content from Defendants' human resources department, which caused her customer service score to drop for not attending to customers, for reasons Plaintiff does not clearly explain. *Id.* ¶ 37. According to Plaintiff, this was a deviation from the human resources department's normal policy of sending instant messages to Plaintiff's supervisor rather than to Plaintiff directly. *Id.*

Roughly two or three months[9] after Defendants added the supervisory duties, Plaintiff requested that she be exempted from the supervisory duties of the OJT position but otherwise allowed to retain her title (the "Third Accommodation Request"). *Id*. ¶ 16; Defs.' Proposed Undisputed Facts ¶ 8; Pl.'s Resp. to Proposed Undisputed Facts ¶ 8. Plaintiff made the Third Accommodation Request because her mental illness prevented her from performing supervisory duties. Pl.'s Aff. ¶ 16. Defendants requested that Plaintiff provide medical documentation to substantiate the Third Accommodation Request. *Id*.  Defendants gave Garcia a written description of Plaintiff's job duties. Defs.' Ex. 5-6. Garcia annotated this description to indicate which duties Plaintiff could and could not perform given her health status, and returned the annotated description to Defendants. *Id*.; Defs.' Proposed Undisputed Facts ¶ 10; Pl.'s Resp. to Proposed Undisputed Facts ¶ 10; Pl.'s Dep. 41. Garcia specified that Plaintiff was medically unable to perform the supervisory and coaching duties of the OJT position as newly constituted. Defs.' Ex. 5-6; Defs.' Proposed Undisputed Facts ¶ 10; Pl.'s Resp. to Proposed Undisputed Facts ¶ 10; Pl.'s Dep. 41, 48. In response, Defendants demoted Plaintiff to her previous CSS III position on either June 14 or 15 of 2012 (the "Second Demotion").[10] Pl.'s Aff. ¶¶ 17, 38; Defs.'

---

[9] Plaintiff alleges she made the Third Accommodation Request (defined below) on or about June 1, 2012, but uncontroverted documentary evidence produced by Defendants indicates that Plaintiff in fact made the Third Accommodation Request in early May. *Compare* Pl.'s Aff. ¶ 16 *with* Defs.' Ex. 5-6. As explained below, the exact date of the Third Accommodation Request is irrelevant because the Third Accommodation Request was unreasonable as a matter of law.

[10] Defendants argue that the Second Demotion was not a demotion at all because, as Plaintiff admits, "[Plaintiff's] job title was the only item that changed. Her rate of pay, work schedule, and days off remained the same." Defs.' Proposed Undisputed Facts ¶ 11; Pl.'s Resp. to Proposed Undisputed Facts ¶ 11; Summ. Judg. Mot. 6-7. *Accord* Pl.'s Dep. 45-46. *But see* Pl.'s Dep. 49 (explaining that Plaintiff no longer had holidays off in the CSS III position); *id*. at 54-55 (indicating that an OJT position was of a higher grade than the CSS III position). It is true that a change in position that is not objectively worse than the previous position is not an adverse employment action as a matter of law. *E.g.*, *Hernandez*, 2012 WL 641033, at *6 (citations omitted). However, to accept Defendants' position on this score would require the Court to resolve evidentiary conflicts in favor of Defendants, which the Court cannot do at the summary judgment stage. The Court therefore assumes that the Second Demotion was, in fact, a demotion.

Proposed Undisputed Facts ¶ 11; Pl.'s Resp. to Proposed Undisputed Facts ¶ 11; Pl.'s Dep. 41, 45. This position carried no supervisory duties. Defs.' Proposed Undisputed Facts ¶ 11; Pl.'s Resp. to Proposed Undisputed Facts ¶ 11.

Plaintiff was hospitalized again from late June 2012[11] to July 27, 2012. Pl.'s Aff. ¶¶ 18, 39. Plaintiff alleges this hospitalization was due to post-traumatic stress disorder caused by Defendants' treatment of her. *Id.* ¶¶ 18, 39, 41. Defendants granted Plaintiff FMLA leave for this absence. Defs.' Proposed Undisputed Facts ¶ 12; Pl.'s Resp. to Proposed Undisputed Facts ¶ 12. Plaintiff thereby exhausted the FMLA leave to which she was entitled. Defs.' Proposed Undisputed Facts ¶ 12; Pl.'s Resp. to Proposed Undisputed Facts ¶ 12.

Following Plaintiff's release from the hospital, Garcia submitted documentation to Defendants indicating that Plaintiff needed a two-year leave of absence from work to tend to her mental health. Pl.'s Aff. ¶ 39; Defs.' Ex. 9; Defs.' Proposed Undisputed Facts ¶ 14; Pl.'s Resp. to Proposed Undisputed Facts ¶ 14, Pl.'s Dep. 99. Plaintiff thereby requested that Defendants accommodate her by granting her two years of medical leave (the "Fourth Accommodation Request").[12] Pl.'s Aff. ¶ 39. Defendants' policies do not generally provide for a two-year leave of absence, and Defendants advised Plaintiff they could not hold her position open for two years. Defs.' Proposed Undisputed Facts ¶¶ 15-16; Pl.'s Resp. to Proposed Undisputed Facts ¶¶ 15-16. Defendants accordingly did not grant Plaintiff the Fourth Accommodation Request. Pl.'s Aff. ¶¶

---

[11] Plaintiff is inconsistent regarding whether this hospitalization began on June 25, 2012, or June 20, 2012. *Compare* Pl.'s Aff. ¶ 18, *with id.* ¶ 39. The timing of this hospitalization is not relevant to the determination of any legal issues in this Order.

[12] Plaintiff refers to the Fourth Accommodation Request as a request for FMLA leave, *see* Pl.'s Aff. ¶ 40; Pl.'s Resp. to Proposed Undisputed Facts ¶ 2, but this is a misnomer; the FMLA does not provide non-military employees like Plaintiff with more than twelve workweeks of medical leave in a twelve-month period, 29 U.S.C. § 2612(a)(1)(D), and Plaintiff admits she had already exhausted her FMLA leave by the time she made the Fourth Accommodation Request. Defs.' Proposed Undisputed Facts ¶ 12; Pl.'s Resp. to Proposed Undisputed Facts ¶ 12.

39-40. Instead, Defendants terminated Plaintiff for failing to return to work after the expiration of her FMLA leave on August 23, 2012 (the "Termination"). *Id.* ¶¶ 21, 39; Defs.' Ex. 10.

Plaintiff and Defendants disagree regarding the extent to which Defendants warned Plaintiff beforehand that if she failed to return to work by a certain date she would be terminated. *Compare* Pl.'s Aff. ¶¶ 39-40 *with* Defs.' Ex. 7-8, 10, 12. Indeed, Plaintiff herself is inconsistent regarding whether Defendants advised her that she would need to return to work by July 31, 2012 to avoid termination. *Compare* Pl.'s Aff. ¶40 ("I did not fail to return to work from leave on any scheduled to return work date, because I was given no such date."), *with* Defs.' Proposed Undisputed Facts ¶ 12; Pl.'s Resp. to Proposed Undisputed Facts ¶ 12 (admitting that she "was advised that she would need to return to work on July 31, 2012"). However, Plaintiff does admit knowledge of Defendants' general policy – which Plaintiff signed and acknowledged on January 18, 2011 – that any employee who fails to return to work after exhausting his or her FMLA leave will be deemed to have voluntarily resigned. Defs.' Proposed Undisputed Facts ¶ 18; Pl.'s Resp. to Proposed Undisputed Facts ¶ 18; Defs.' Ex. 11. The Court assumes Defendants notified Plaintiff beforehand that she could be terminated for failing to timely return to work, but did not inform Plaintiff of the exact date this would occur.

To this day, Plaintiff remains unable to work. Pl.'s Dep. 127. Plaintiff has represented to the Social Security Administration that she is completely disabled. *Id.* Plaintiff has made no efforts to obtain new employment, because she needs further therapy before she will be able to maintain gainful employment. *Id.* Plaintiff currently receives disability benefits. *Id.*

## II.    DISCUSSION

### A.    Summary Judgment Standard

A court must enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam)). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996). Federal Rule of Civil Procedure 56 "permits a court to consider the whole record, and 'not just the portion highlighted by the motion'" for summary judgment. *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093 (5th Cir. 1996) (quoting *Ramirez v. Burr*, 607 F. Supp. 170, 173 (S.D. Tex. 1980)).

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *Wallace v. Tex. Tech. Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996). To show the existence of a genuine dispute, the nonmoving party must support its position with citations to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials[,]" or show "that the materials cited by the movant do not establish the absence . . . of a genuine dispute, or that [the moving party] cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c).

15

A court resolves factual controversies in favor of the nonmoving party, but establishing a factual controversy requires more than "conclusory allegations," "unsubstantiated assertions," or "a 'scintilla' of evidence." *Liquid Air*, 37 F.3d at 1075. Further, when reviewing the evidence, a court must draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh evidence. *Man Roland, Inc. v. Kreitz Motor Express, Inc.*, 438 F.3d 476, 478-79 (5th Cir. 2006) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). Thus, the ultimate inquiry in a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251‑52.

## B.    Plaintiff's Claims Under the ADEA

Plaintiff raises three subsets of claims under the ADEA: a discrimination claim, a wrongful termination claim, and various retaliation claims. The Court addresses Plaintiff's discrimination and wrongful termination claims in this section. Because Plaintiff's ADEA retaliation claims substantially overlap with her retaliation claims under the ADA, the Court addresses them simultaneously below. *See* Pl.'s Aff. ¶ 4 (stating that Plaintiff's complaints under the ADEA and ADA "are so connected to each other that [she is] not able to discern one nefarious motive from the other"); *id*. ¶ 13 (basing the First EEOC Complaint on retaliation for both age and disability).

### 1.    Plaintiff's ADEA discrimination claim

Plaintiff alleges that Defendants repeatedly discriminated against her on the basis of age. Defendants respond that Plaintiff cannot establish that she was treated less favorably than younger employees or that Defendants' reasons for taking adverse employment actions against Plaintiff were pretextual. Summ. Judg. Mot. 13-15. The Court agrees with Defendants that

16

Plaintiff cannot demonstrate that Defendants subjected Plaintiff to unfair treatment because of her age. Therefore, the Court need not reach the question of pretext.

### a.    *McDonnell Douglas*

Because Plaintiff's ADEA discrimination claim is based on circumstantial evidence, the order and allocation of proof is governed by the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-05 (1973).[13] *Accord, e.g.*, *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 301 (5th Cir. 2000) (applying *McDonnell Douglas* to claims under the ADEA). The *McDonnell Douglas* framework has three steps:

First, the plaintiff "carr[ies] the initial burden . . . of establishing a prima facie case." *McDonnell Douglas*, 411 U.S. at 802. This burden is merely an initial burden of production; "what is required to establish the *McDonnell Douglas* prima facie case is infinitely less than what a directed verdict demands." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). Plaintiff need only present "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (emphasis omitted) (quoting *Teamsters v. United States*, 431 U.S. 324, 358 (1977)).

If Plaintiff establishes her prima facie case, "[t]he burden then [shifts] to [Defendants] to articulate some legitimate, nondiscriminatory reason for" the challenged employment actions. *McDonnell Douglas*, 411 U.S. at 802. This stage of the *McDonnell Douglas* framework "involve[s] no credibility assessment." *St. Mary's*, 509 U.S. at 509.  If Defendants fail to articulate a nondiscriminatory reason at this stage, "the [C]ourt must enter judgment for

---

[13] If Plaintiff instead alleged mixed motives, a slightly different analytical framework might apply. *See Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 308-12 (5th Cir. 2004), *abrogated in non-relevant part*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 173-180 (2009).

[P]laintiff because no issue of fact remains in the case." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Defendants "need not persuade the [C]ourt" at this stage "that it was actually motivated by the proferred reasons;" rather, Defendants "need only produce admissible evidence that would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* at 254, 257. However, Defendants' "explanation of its legitimate reasons must be clear and reasonably specific." *Id.* at 258 (citing *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1011-12 n.5 (1st Cir. 1979)).

Last, if Defendants articulate a non-discriminatory reason for the adverse employment action, "the burden then shifts back upon [Plaintiff] to establish . . . that the articulated reason was merely a pretext for unlawful discrimination." *McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 280 (5th Cir. 2000) (citing *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995)). At stage three, the *McDonnell Douglas* presumptions "drop[] from the case;" that is, Plaintiff carries the ultimate burden of demonstrating that Defendants did in fact discriminate against her. *Burdine*, 450 U.S. at 255 n.10; *accord*, *e.g.*, *St. Mary's*, 509 U.S. at 507-08. However, even though the *McDonnell Douglas* presumptions become irrelevant at this stage, the Court may still "consider the evidence establishing [P]laintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether [Defendants'] explanation is pretextual.'" *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 255 n.10).

The ADEA makes it illegal for an employer to, among other things, "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Thus, to establish a prima facie case with respect to her age discrimination claim at *McDonnell Douglas* step one, Plaintiff must show: (1) she was

subject to an adverse employment action; (2) she was qualified for the position; (3) she was within the protected class - i.e., over the age of 40 - at the time of the adverse employment action; and (4) she was either (a) replaced by someone outside the protected class, (b) replaced by someone younger, or (c) otherwise subjected to an adverse employment action because of her age. *E.g.*, *Rachid*, 376 F.3d at 309 (citing *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576 (5th Cir. 2003)). *See also O'Connor*, 517 U.S. at 312 (holding that ADEA plaintiff need not show that he or she was replaced by someone under the age of 40, but rather that plaintiff is over 40 and was subject to discrimination because of his or her age). The ADEA, unlike other employment discrimination statutes, requires Plaintiff to demonstrate not merely that age was a motivating factor in the adverse employment decision, but "that age was the 'but-for' cause of the employer's adverse decision." *Gross*, 557 U.S. at 173-77 (citations omitted).

### b.     Plaintiff cannot satisfy her prima facie case because she cannot demonstrate she was treated less favorably because of her age

Plaintiff's ADEA discrimination claim fails at *McDonnell Douglas* step one because she cannot satisfy her prima facie case. Specifically, Plaintiff offers no evidence that she was treated less favorably because of her age.

Plaintiff argues she has a viable ADEA claim because, *inter alia*, she was subject to an adverse employment decision because of her diverticulitis, and diverticulitis is "in part age-related."[14] Pl.'s Am. Compl. ¶¶ 20-21, 23. Where an employer uses an age-correlated variable as a proxy for age and discriminates accordingly, ADEA liability may lie.[15] *Hazen Paper Co. v.*

---

[14] The Court assumes without deciding that diverticulitis is indeed age-related.

[15] It is not necessarily clear which non-age factors are so related to age that they are mere proxies, or if any such factors exist at all. *Smith v. City of Jackson, Miss.*, 351 F.3d 183, 191 (5th Cir. 2003) (declining to "speculate on what such factors might be"). The Court is unable to conclude, however, that Defendants used Plaintiff's diverticulitis as a proxy for age, for the reasons below.

*Biggins*, 507 U.S. 604, 613 (1993). However, that does not alter Plaintiff's burden to demonstrate

that Defendants discriminated against her *because of her age*, and not because of some age-

correlated factor. *See Hazen*, 507 U.S. at 610-14 ("Whatever the employer's decisionmaking

process, a disparate treatment claim cannot succeed unless the employee's protected trait actually

played a role in that process and had a determinative influence on the outcome . . . This is true

even if the motivating factor is correlated with age . . ."). This is because "the ADEA was not

intended to remedy age-disparate effects that arise from the application of employment . . .

practices that are not based on age." *Smith*, 351 F.3d at 187.

    As a consequence, Plaintiff's ADEA discrimination claim fails insofar as it is predicated

on her diverticulitis alone. "Because [a particular disease] may be more prevalent in older

employees does not alone make the decision an age-related decision." *Beith v. Nitrogen Prods.,*

*Inc.*, 7 F.3d 701, 703 (8th Cir. 1993). "Congress made plain that the age statute was not meant to

prohibit employment decisions based on factors that sometimes accompany advancing age[.]"

*Beith*, 7 F.3d at 703 (quoting *Holley v. Sanyo Mfg., Inc.*, 771 F.2d 1161, 1167 (8th Cir. 1985)).

*Accord Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 152 (5th Cir. 1995); *Lyon v. Ohio*

*Educ. Ass'n & Prof'l Staff Union*, 53 F.3d 135, 138-39, 140 (6th Cir. 1995) (citations omitted);

*Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991) ("*Republic*"). As a result,

"terminating employees based on age-related disabilities does not violate the ADEA." *Geiger v.*

*AT&T Corp.*, 962 F. Supp. 637, 643 (E.D. Pa. 1997) (citing *Beith*, 7 F.3d at 703). *Accord*

*Sperling v. Hoffman-La Roche, Inc.*, 924 F. Supp. 1396, 1407-08 (D.N.J. 1996). Plaintiff's

ADEA claim can only succeed if age, and not variables that are merely correlated with age,

actually motivated Defendants' decision. *See, e.g.*, *Hazen*, 507 U.S. at 610-14. Accordingly, at

least for the purposes of Plaintiff's ADEA claim,[16] the Court considers only whether Plaintiff has demonstrated a genuine issue of material fact regarding whether Defendants discriminated against her on the basis of age or some proxy for age, and not on the basis of her diverticulitis alone.

To reiterate, to satisfy her prima facie case, Plaintiff must, among other things, demonstrate that she was either replaced by someone younger or otherwise subjected to an adverse employment action because of her age. Plaintiff offers no evidence that, following her demotion and subsequent termination, a younger employee took her place. *See* Pl.'s Am. Compl. ¶¶ 15-36; Pl.'s Resp. ¶¶ 1-7, 11; Pl.'s Resp. to Proposed Undisputed Facts ¶¶ 1-23; Pl.'s Disputed Issues of Material Fact ¶¶ 1-7; Pl.'s Aff. ¶¶ 1-45. Nor has Plaintiff identified direct evidence, such as ageist comments,[17] from which a jury could infer age discrimination. *See, e.g.*, *Wyvill*, 212 F.3d at 304 (citing *EEOC v. Tex. Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996)). Nor has Plaintiff introduced evidence of internal memoranda prepared by Defendants that would indicate an intent to discriminate against Plaintiff because of her age or to thin the ranks of older employees generally. *See Palasota*, 342 F.3d at 576-77.

In the absence of such evidence, "[Plaintiff] must show that [Defendants] gave preferential treatment to a younger employee under 'nearly identical' circumstances." *Wyvill*, 212 F.3d at 304 (quoting *Republic*, 924 F.2d at 97). This means that Plaintiff must demonstrate

---

[16] Of course, even if an employment decision based on an employee's diverticulitis does not violate ADEA, it could violate the ADA. *Cf. Hazen*, 507 U.S. at 612. The Court considers that possibility below.

[17] Pl.'s Dep. 85 (stating that Plaintiff could not recall any ageist comments directed at her). *See also* Pl.'s Am. Compl. ¶¶ 15-36; Pl.'s Resp. ¶¶ 1-7, 11; Pl.'s Resp. to Proposed Undisputed Facts ¶¶ 1-23; Pl.'s Disputed Issues of Material Fact ¶¶ 1-7; Pl.'s Aff. ¶¶ 1-45 (failing to identify any ageist comments). Plaintiff does allege that other employees made offensive comments about her diverticulitis, *see, e.g.*, Pl.'s Aff. ¶¶ 6, 13, but, for the reasons stated above, alleged discrimination with respect to an age-related medical condition cannot support a claim for age discrimination under the ADEA.

that a younger employee with the same job position and duties, supervised by the same superiors, experienced substantially similar employment problems as Plaintiff, but was not subject to the same adverse employment actions. *See*, *e.g.*, *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001) ("*Methodist*"). The comparator employee need not be completely identical to Plaintiff, but Plaintiff and the comparator must be nearly identical in all relevant respects other than age. *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260-62 (5th Cir. 2009). That is, Plaintiff must identify a younger employee in the same position, subject to direction from the same supervisors, who suffered from similar debilitating health problems, but was not demoted, terminated, or subject to any of the same adverse treatment as Plaintiff. *See id*. at 259-60.

Plaintiff has failed to provide such evidence. Plaintiff makes only two allegations regarding how Defendants treated younger employees, both of which relate to the First Demotion. *See* Pl.'s Am. Compl. ¶ 28; Pl.'s Aff. ¶ 25. First, Plaintiff alleges: "On or about April 2010, when I got demoted there was another co-worker named Angela Acosta ("Acosta") who got really low scores and she never got demoted for that reason, yet this was the same reason why I got demoted. I was much older than Angela, *and Angela did not suffer from any disabilities of [sic] work-related mental health issues*." Pl.'s Aff. ¶ 25 (emphasis added). The last sentence of this allegation belies the suggestion that Plaintiff and Acosta were similarly situated. To demonstrate age discrimination, Plaintiff must show not that a younger employee with comparable performance scores was treated more favorably, but that a younger employee with comparable scores *and similar health problems that interfered with his or her work performance* was treated more favorably. *See*, *e.g.*, *Lee*, 574 F.3d at 260. Otherwise, the Court is unable to infer that the disparate treatment of Plaintiff was due to her age, rather than the disability that interfered with Plaintiff's work performance. *Cf. Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d

22

893, 901 (5th Cir. 2002) (holding that factfinder could not permissibly infer that employer treated younger employee more favorably than older employee on the basis of age when older employee had also been accused of gender discrimination); *Hernandez*, 2012 WL 641033, at *10 (holding that a factfinder could not permissibly infer that employees were treated differently on the basis of race where employees could also be distinguished on the basis of other variables). To be sure, the implication that the disparate treatment of Plaintiff and Acosta may have stemmed from Plaintiff's health issues may be probative of disability discrimination – the court addresses that possibility below – but this allegation is not probative of age discrimination.

The same may be said of Plaintiff's second allegation: "Defendants had other employees performing the same duties as Plaintiff performed, who were performing at a lower level than Plaintiff's work performance, yet they were not demoted. These other employees who were not demoted are all younger than Plaintiff." Pl.'s Am. Compl. ¶ 28. Again, without identifying these employees, or describing whether or not they experienced similar problems that affected their job performance, or indicating whether these employees answered to the same supervisors, there is no evidence that these employees were similarly situated to Plaintiff, so this allegation is not probative of age discrimination. *See Lee*, 574 F.3d at 260-62; *Wyvill*, 212 F.3d at 305.

As for the Second Demotion and the Termination, Plaintiff does not identify any younger employees who were terminated or demoted under nearly identical circumstances at all. *See* Pl.'s Am. Compl. ¶¶ 15-36; Pl.'s Resp. ¶¶ 1-7, 11; Pl.'s Resp. to Proposed Undisputed Facts ¶¶ 1-23; Pl.'s Disputed Issues of Material Fact ¶¶ 1-7; Pl.'s Aff. ¶¶ 1-45. Indeed, Plaintiff specifically admits that she "cannot identify any [employee of Defendants] who was unable to work for two years, but was not terminated." Defs.' Proposed Undisputed Facts ¶ 17 (citing Pl.'s Dep. 101-102); Pl.'s Resp. to Proposed Undisputed Facts ¶ 17. Thus, just as Plaintiff has failed to

demonstrate that the First Demotion was the product of age discrimination, Plaintiff has not raised a genuine issue of material fact regarding whether the Second Demotion or the Termination were the product of age discrimination.

In sum, Plaintiff has produced no competent evidence that similarly situated younger employees in nearly identical circumstances were not subject to similar adverse employment actions. Having failed to identify even one appropriate comparator, and having failed to offer any other evidence that Defendants otherwise demoted or discharged her because of her age, Plaintiff has failed to establish a prima facie case for age discrimination. *See Lee*, 574 F.3d at 255; *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 223-24 (5th Cir. 2000). The Court therefore grants summary judgment in favor of Defendants on Plaintiff's age discrimination claim under ADEA.

### 2.      Plaintiff's wrongful termination claim under the ADEA

In addition to her claim for employment discrimination, Plaintiff also brings a claim for "wrongful termination of employment" under the ADEA. Pl.'s Am. Compl. ¶ 1. Because the employment discrimination provision of the ADEA prohibits unlawful discharge on the basis of age, 29 U.S.C. § 623(a)(1) ("It shall be unlawful for an employer . . . to fail or refuse to hire *or to discharge* any individual . . . because of such individual's age" (emphasis added)), Plaintiff's wrongful termination claim appears to be duplicative of her employment discrimination claim. *Cf. Parikh v. UPS*, 491 F. App'x 303, 307 (3d Cir. 2012) ("Parikh's wrongful termination claim was based on the same set of facts as his discrimination claims. We agree . . . that a common law wrongful termination claim was duplicative, as it would not protect any interest beyond Parikh's claims under . . . the ADEA."). Therefore, Plaintiff's wrongful termination claim fails for the same reasons as her employment discrimination claim, so the Court grants summary judgment in favor of Defendants on this claim.

24

### C.      Plaintiff's Claims Under the ADA

Having disposed of Plaintiff's discrimination and wrongful termination claims under the

ADEA, the Court addresses Plaintiff's analogous claims under the ADA. The Court then

considers Plaintiff's retaliation and hostile work environment claims under both the ADA and

the ADEA.

### 1.      Plaintiff's ADA discrimination claims

Plaintiff alleges that Defendants repeatedly discriminated against her on the basis of her

diverticulitis and mental health issues in violation of the ADA. Defendants respond, *inter alia*,

that Plaintiff was not qualified for her position at the time of the adverse employment actions,

and that Defendants' reasons for taking adverse employment actions against Plaintiff were either

(1) not related to her disability or (2) legitimate and nonpretextual.

### a.      *McDonnell Douglas* step one: Plaintiff's prima facie case

The *McDonnell Douglas* framework applies to Plaintiff's ADA discrimination claim just

as it applies to her ADEA discrimination claim. *E.g.*, *McInnis*, 207 F.3d at 279. To establish a

prima facie case for her discrimination claim under the ADA, Plaintiff must prove (1) she was

disabled or was regarded by Defendants as disabled; (2) she was qualified for her position; (3)

she was subjected to an adverse employment action on account of her disability; and (4) she was

replaced by, or treated less favorably than, non-disabled employees. *E.g.*, *id.* at 279-80 (citing

*Burch v. Coca-Cola Co.*, 119 F.3d 305, 320 (5th Cir. 1997) ("*Coca-Cola*")). Defendants appear

to agree that Plaintiff satisfies the first element, but Defendants dispute the remaining elements.

"For discrimination claims under . . . the ADA, only 'ultimate employment decisions,'

such as hiring, granting leave, discharging, promoting, or compensating, constitute adverse

employment action."[18] *Keel v. Wal-Mart Stores, Inc.*, No. 1:11–CV–248, 2012 WL 3263575, at

*8 (E.D. Tex. July 17, 2012) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67

(2006); *McKay v. Johanns*, 265 F. App'x 267, 268-69 (5th Cir. 2008); *McCoy v. City of

Shreveport*, 492 F.3d 551, 560 (5th Cir. 2007)). *Accord McGregor v. United Healthcare Servs.,

Inc.*, Civil Action No. H–09–2340, 2010 WL 3082293, at *3 (S.D. Tex. Aug. 6, 2010) (citing

*Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 769 (5th Cir. 2001)). As a result, only three

of the employment actions Plaintiff identifies qualify as adverse employment actions for the

purposes of Plaintiff's ADA discrimination claim: the First Demotion, the Second Demotion, and

the Termination.[19] *See, e.g., Hernandez*, 2012 WL 641033, at *6 (holding that "[a] change in

position or job duties can constitute an adverse employment action" if "the new position or

responsibilities are objectively worse") (citing *Alvarado v. Tex. Rangers*, 492 F.3d 605, 613-15

(5th Cir. 2007); *Forsyth v. City of Dallas*, 91 F.3d 769, 774 (5th Cir. 1996)).

    As the Court explains below, Plaintiff cannot establish her prima facie case with respect

to the Second Demotion or the Termination because she admits she was not qualified for the

position at the time of those adverse employment actions.[20] As for the First Demotion, Plaintiff

---

[18] As will be explained below, this definition of "adverse employment action" applies only in discrimination cases, not retaliation cases. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63-64, 67-69 (2006).

[19] Plaintiff alleges that she was denied intermittent FMLA leave in November 2010. Pl.'s Aff. ¶ 30. Denial of leave can constitute an adverse employment action that could give rise to an ADA discrimination claim. *E.g., Keel*, 2012 WL 3263575, at *8 (citations omitted). However, Plaintiff appears to allege only that this denial amounted to an act of retaliation, not an act of discrimination. Pl.'s Aff. ¶ 30 ("This was done *in retaliation* for my needing and having requested reasonable accommodations . . ." (emphasis added)). Even assuming that Plaintiff raised this denial of leave in the context of her ADA discrimination claim, however, it would fail; Plaintiff offers nothing but a threadbare assertion that Defendants' decision was motivated by discriminatory animus. *See id*. This is insufficient to survive summary judgment. *E.g., Liquid Air*, 37 F.3d at 1075.

[20] The court does not decide whether or not Plaintiff met the other elements of her prima facie case with respect to these two adverse employment actions.

has failed to provide evidence that disability was a motivating factor behind Defendants'

decision, or that non-disabled employees were treated more favorably than her. Even if Plaintiff

had established a prima facie case for the First Demotion, she cannot demonstrate pretext. As a

result, the Court grants summary judgment to Defendants on all of Plaintiff's ADA

discrimination claims.

### i.      Plaintiff was not qualified for her position at the time of the Second Demotion or the Termination

Under the ADA, an individual with a disability is qualified for a position if that

individual, "with or without reasonable accommodation, can perform the essential functions of

the employment position that such individual holds[.]" 42 U.S.C. § 12111(8). Consequently, to

avoid summary judgment, Plaintiff must show (1) she could perform the essential functions of

the job in spite of her disability, or (2) that a reasonable accommodation would have enabled her

to perform the essential functions of the position. *Burch v. City of Nacogdoches*, 174 F.3d 615,

619 (5th Cir. 1999) ("*Nacogdoches*") (citing *Turco*, 101 F.3d at 1093). As a result,

> a fired (demoted, etc.) worker who cannot do the job even with a reasonable
> accommodation has no claim under the [ADA] . . . An individual who cannot
> perform the essential functions of the job even with a reasonable accommodation
> to h[er] disability by the employer is not 'qualified,' 42 U.S.C. § 12111(8), so the
> [ADA] does not come into play. It is irrelevant that the lack of qualification is due
> entirely to a disability . . . even though [the employee] can show that [s]he would
> be fully qualified were it not for h[er] disability].

*Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1195 (7th Cir. 1997). *Accord Duckett v.
Dunlop Tire Corp.*, 120 F.3d 1222, 1225 (11th Cir. 1997); *Rogers v. Int'l Marine Terminals,
Inc.*, 87 F.3d 755, 759 (5th Cir. 1996) (citing *Carr v. Reno*, 23 F.3d 525, 530 (D.C. Cir. 1994);
*Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994)). *See also McConathy
v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 562-63 (5th Cir. 1998) (holding that employee who
stated on social security disability benefits application that she was unable to hold any position
even on a part-time basis was judicially estopped from arguing she was a qualified employee
under the ADA).

As the Court explains below, Plaintiff's ADA discrimination claims predicated on the

Second Demotion fail because Plaintiff was not qualified for the OJT position at the time she was demoted. Furthermore, Plaintiff was not qualified for any employment at all at the time of the Termination.

Garcia, in the annotated OJT job description she submitted to Defendants prior to the Second Demotion, declared that Plaintiff was medically unable to perform the supervisory and coaching duties of the OJT position as newly constituted. Defs.' Ex. 5-6; Defs.' Proposed Undisputed Facts ¶ 10; Pl.'s Resp. to Proposed Undisputed Facts ¶ 10; Pl.'s Dep. 41, 48. Plaintiff admits these new duties were essential functions of the OJT position as newly constituted. Defs.' Proposed Undisputed Facts ¶ 9; Pl.'s Resp. to Proposed Undisputed Facts ¶ 9. As a result, Plaintiff was unable to perform the essential functions of her position and therefore was not qualified to be an OJT at the time of the Second Demotion. *See Nacogdoches*, 174 F.3d at 619-20; *Matthews*, 128 F.3d at 1195; *Rogers*, 87 F.3d at 759 (citing *Carr*, 23 F.3d at 530; *Tyndall*, 31 F.3d at 213); *Turco*, 101 F.3d at 1093-94.

Nor was the Third Accommodation Request, whereby Plaintiff sought to be relieved from supervisory duties while still retaining the OJT position, a reasonable accommodation that would have rendered Plaintiff qualified for the OJT position. The ADA does not require an employer to adopt every accommodation an employee requests; in particular, the employer need not adopt accommodations that are unreasonable, such as where the accommodation would impose an undue hardship on the employer. *E.g.*, *Nacogdoches*, 174 F.3d at 619 (citing 42 U.S.C. § 12112(b)(5)(A)). In particular, "[t]he ADA does not require an employer to relieve an employee of any essential functions of his or her job, modify those duties, reassign existing employees to perform those jobs, or hire new employees to do so." *Id*. at 621 (citing *Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 295 (5th Cir. 1998); *Barber v. Nabors Drilling U.S.A., Inc.*,

28

130 F.3d 702, 709 (5th Cir. 1997)). *Accord Turco*, 101 F.3d at 1094 (citing *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir. 1995); 29 C.F.R. § 1630.2(p)(2)(v)). In other words, the employer "is not required to create light duty jobs to accommodate disabled employees." *Turco*, 101 F.3d at 1094 (citing *Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir. 1995), *cert. denied*, 516 U.S. 1172 (1996)). Thus, the ADA did not require Defendants to retain Plaintiff as an OJT while relieving her of supervisory duties, because doing so would amount to relieving Plaintiff of the essential functions of her job and creating a special light duty job to accommodate Plaintiff. *See Nacogdoches*, 174 F.3d at 621; *Turco*, 101 F.3d at 1094 (citing *Daugherty*, 56 F.3d at 700). Defendants therefore did not discriminate against Plaintiff in subjecting her to the Second Demotion.

Likewise, Plaintiff was not qualified for *any* position with Defendants at the time of the Termination. Plaintiff admits that her doctor ordered her to not work for a two-year period beginning slightly before the Termination. Defs.' Proposed Undisputed Facts ¶ 14; Pl.'s Resp. to Proposed Undisputed Facts ¶ 14. Thus, at the time of the Termination, Plaintiff was unable to perform *any* work for an extended period of time, let alone the essential functions of her position. Plaintiff was therefore not qualified for the position with or without a reasonable accommodation. *See Matthews*, 128 F.3d at 1195; *Nacogdoches*, 174 F.3d at 619-20; *McConathy*, 131 F.3d at 562-63; *Rogers*, 87 F.3d at 759 (citing *Carr*, 23 F.3d at 530; *Tyndall*, 31 F.3d at 213); *Turco*, 101 F.3d at 1093-94.

Some courts do hold that, at least in some circumstances, granting a leave of absence when an employee is wholly unable to work can be a reasonable accommodation that renders the employee qualified for the position, as long as the leave requested is of relatively short duration

and the employee specifies the expected duration of his or her impairment.[21] *Valdez v. McGill*, 462 F. App'x 814, 818 (10th Cir. 2012) (unpublished) (citations omitted); *Criado v. IBM Corp.*, 145 F.3d 437, 440, 443-45 (1st Cir. 1998); *Villalon v. Del Mar Coll. Dist.*, Civil Action No. C-09-252, 2010 WL 3221789 (S.D. Tex. Aug. 13, 2010) ("Although the Fifth Circuit has not addressed this issue specifically, many other circuits have held that a 'reasonable accommodation' may include seeking medical leave." (citations omitted)). The Court must therefore consider whether the Fourth Accommodation Request was a reasonable accommodation that would render Plaintiff qualified for her position at the time of the Termination.

"[R]easonable accommodation is by its terms most logically construed as that which presently, or in the immediate future, enables the employee to perform the essential functions of the job in question[.]" *Rogers*, 87 F.3d at 759-60 (quoting *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995)). *Accord Duckett*, 120 F.3d at 1226. However, leave requests of indefinite duration or in excess of one year are typically "found to be unreasonable as a matter of law." *EEOC v. Journal Disposition Corp.*, 1:10-CV-886, 2011 U.S. Dist. LEXIS 124177, at *10 (W.D. Mich. Oct. 27, 2011) (citing *Corder v. Lucent Techs., Inc.*, 162 F.3d 924 (7th Cir. 1998); *Duckett*, 120 F.3d 1222; *Rogers*, 87 F.3d 755). *Accord Walsh v. UPS*, 201 F.3d 718, 727 (6th Cir. 2000) ("Our review of case law . . . disclosed no cases where an employer was required to allow an employee

---

[21] *But see Munoz v. Echosphere L.L.C.*, No. 09-CV-0308-KC, 2010 WL 2838356 (W.D. Tex. July 15, 2010) (Cardone, J.) ("FMLA leave is not a reasonable accommodation under the ADA; rather it is a right enforceable under a separate statutory provision.") (quoting *Trevino v. UPS*, No. 3:08-CV-889-B, 2009 U.S. Dist. LEXIS 98738, at *38-39 (N.D. Tex. Oct. 23, 2009)). Whereas this Court in *Munoz* rejected the proposition that *FMLA leave* could constitute a reasonable accommodation under the ADA, here the Court is faced with the question of whether granting *non-FMLA leave*, after the employee has already exhausted her FMLA leave, can ever constitute a reasonable accommodation. The Court need not resolve this question. No matter whether non-FMLA leave can ever be a reasonable accommodation under the ADA, the length of leave Plaintiff requested and required was unreasonable as a matter of law.

30

to take a leave of absence for well over in excess of a year . . ." (citations omitted)). "[T]he ADA has never been interpreted by any court to require an employer to hold an employee's position open for two years . . . on the chance that the employee might recover and might decide to return to work at a later time." *Miller v. Village of Oxford*, Case No. 97-CV-60046-AA, 1998 U.S. Dist. LEXIS 17541, at *18 (E.D. Mich. Nov. 5, 1998) (citing *Myers*, 50 F.3d at 283). Although "ADA regulations may possibly be violated if [Plaintiff] was terminated immediately upon becoming disabled without a chance to use h[er] leave to recover," *Duckett*, 120 F.3d at 1226 n.2, "when, as here, an employer has already provided a substantial leave, an additional leave period of a significant duration, with no clear prospects for recovery, is an objectively unreasonable accommodation." *Walsh*, 201 F.3d at 727. As a result, the Fourth Accommodation Request was not reasonable. Plaintiff was therefore not qualified at the time of the Termination.

Thus, Plaintiff has failed to establish her prima facie case as to the Second Demotion or the Termination. Consequently, her ADA discrimination claims based on those adverse employment actions founder at step one of *McDonnell Douglas*. There is therefore no need to analyze steps two and three as to those claims.

> **ii.    Plaintiff cannot establish multiple elements of her prima facie discrimination case based on the First Demotion because there is no evidence the First Demotion was motivated by discriminatory animus**

For the reasons set forth below, Plaintiff cannot establish her prima facie case of ADA discrimination with respect to the First Demotion because she cannot prove Defendants demoted her because of her disabilities. *See Hamilton v. S.W. Bell Tel. Co.*, 136 F.3d 1047, 1050 (5th Cir. 1998) ("*S.W. Bell*") (citing 42 U.S.C. § 12111(a)). *Accord, e.g., Moody v. M.W. Kellogg Co.*, 1999 WL 153032, at *5-6 (5th Cir. Mar. 8, 1999). "Under the ADA, discrimination need not be

the sole reason for the adverse employment decision" to be actionable, but it must at least be a "motivating factor;" that is, the employee's disability "must actually play a role in the employer's decision making process and have a determinative influence on the outcome." *Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir. 2008) (citing *Soledad v. United States Dep't of Treasury*, 304 F.3d 500, 503-04 (5th Cir. 2002)). Plaintiff argues that she satisfies this causal standard because (1) Defendants demoted her at the same time that she had a doctor's appointment; (2) Defendants acted as if Plaintiff had a contagious disease at the time of the First Demotion; and (3) two of Defendants' managers made disability-related comments shortly before the First Demotion.

In response, Defendants argue that the First Demotion was not based on Plaintiff's disability at all.[22] Defendants offer voluminous evidence that the First Demotion instead occurred as part of an office-wide effort to "adjust the ratios between agents and coaches," pursuant to which demotions were issued systematically on the basis of well-defined performance and leadership metrics. Delgado Decl. ¶ 3; Defs.' Proposed Undisputed Facts ¶ 3; Defs.' Ex. 4. These metrics are facially disability-neutral. Delgado Decl. ¶ 3; Defs.' Proposed Undisputed Facts ¶ 3; Defs.' Ex. 4. Defendants demoted the five coaches who received the

---

[22] The Court recognizes that much of Defendants' evidence that the First Demotion was not based on Plaintiff's disability might be more relevant to *McDonnell Douglas* steps two and three insofar as Defendants seek to disprove Plaintiff's causation arguments by pointing to an alternative reason for the First Demotion. The Court nonetheless at least previews Defendants' evidence on this score here because much of it is inextricably intertwined with Plaintiff's arguments that her disability motivated the First Demotion. The Court stresses that its decision to do so is merely stylistic and not outcome-determinative, especially given that the Supreme Court "never intended" the *McDonnell Douglas* framework "to be rigid, mechanized, or ritualistic," *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978), and "[t]he ultimate burden of persua[sion] . . . remains at all times with [P]laintiff" to demonstrate that Defendants discriminated against her on the basis of her disability. *Burdine*, 450 U.S. at 253. Thus, whether the Court describes the relevant evidence at step one, step two, or step three of *McDonnell Douglas*, the point is the same: Plaintiff must show that the First Demotion was based, at least in part, on her disability, and Plaintiff has failed to do so.

lowest combined performance and leadership scores. Delgado Decl. ¶ 3. According to

Defendants, because Plaintiff's work performance for the three months preceding the First

Demotion was poor, she fell within the range of the lowest-performing employees, and was

demoted accordingly. Pl.'s Aff. ¶ 25; Defs.' Proposed Undisputed Facts ¶ 3. Plaintiff does not

dispute that Defendants implemented a disability-neutral, location-wide reduction-in-force

campaign; she merely asserts that Defendants utilized this campaign as a convenient cover to

discriminate against her on the basis of disability.

The Fifth Circuit has held that where an employer has implemented a "reduction-in-

force" campaign "based on objective criteria," the employee challenging that reduction in force

may only survive summary judgment if he or she offers some evidence that "the ultimate

decision maker[] relied on impermissible criteria when creating the reduction-in-force list."

*Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 652-53 (5th Cir. 2004). As a result, Plaintiff can

only survive summary judgment if she can produce more than a scintilla of evidence that the

First Demotion was in fact the product of disability discrimination. *See Liquid Air*, 37 F.3d at

1075.

Plaintiff has failed to do so. First, Plaintiff argues that "the timing of [the First Demotion]

– during the exact time [she] was to be at a doctor's appointment for [her] disability – sent an

unmistakable message:" that Defendants demoted Plaintiff because of her disability. Pl.'s Aff. ¶

9. This coincidence might be probative of discriminatory motive if Plaintiff did not also admit

that the decision to demote her was made before she informed her supervisors she was leaving

early for a doctor's appointment. *Id.*; Pl.'s Dep. 141. This greatly reduces the likelihood that the

First Demotion was disability-related. *See Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188

(5th Cir. 1997). Moreover, Plaintiff readily admits that four other coaches were demoted on the

same day. Defs.' Proposed Undisputed Facts ¶ 3; Pl.'s Resp. to Proposed Undisputed Facts ¶ 3;

Pl.'s Dep. 57-58. *See also Republic*, 924 F.2d at 97 ("The two employees discharged, Little and

Propst, received the two lowest scores in the October evaluation . . . This demonstrates a likely

reliance by Republic upon the October 1985 evaluations rather than on [discriminatory

criteria].")."). Plaintiff does not allege that the other demoted coaches were also disabled, or that

Defendants strategically demoted other coaches to cover up the fact that Defendants were

demoting Plaintiff on account of her disability. As a result, Plaintiff has not produced evidence

sufficient to allow a fact finder to conclude that the First Demotion was connected to her

disability.

Plaintiff also makes much of the fact that "Defendants refus[ed] to hand [her] a document

directly" at the time of the First Demotion, "as if [she] had a contagious disease," which

"communicated to [her] that the demotion was linked to [her] needing to go to doctor's

appointments during work hours and [her] medical condition." Pl.'s Aff. ¶ 10. Plaintiff's

manager instead "put the copy in a folder, instead of handing it to [Plaintiff]." *Id*. ¶ 9. The Court

cannot infer that the manager's failure to make indirect physical contact with Plaintiff at the First

Demotion was motivated by discriminatory animus. To link the manager's actions to a desire to

discriminate on the grounds of disability requires a series of precarious presumptions: namely,

(1) that the manager erroneously believed diverticulitis to be contagious; (2) that the manager's

act of placing the document in a folder was motivated by a desire to avoid physical contact with

Plaintiff; (3) that the manager's desire to avoid physical contact with Plaintiff at the First

Demotion stemmed from Plaintiff's disability and not, say, mere dislike of Plaintiff or the

awkwardness of the situation; etc. This chain of inferences, based entirely on Plaintiff's

subjective interpretation of her former co-workers' actions, is too tenuous and speculative to

34

survive summary judgment. *See Liquid Air*, 37 F.3d at 1075 (holding that summary judgment is proper where the plaintiff submits only unsubstantiated assertions or evidence that is so weak or tenuous that it cannot support a judgment in favor of the nonmovant) (quoting *Armstrong v. City of Dallas*, 997 F.2d 62 (5th Cir. 1993)). Plaintiff's evidence amounts to no more than a mere "belief that [the employer's] decision was motivated by discrimination," but such a belief, "however genuinely held, is not sufficient evidence" to avoid summary judgment. *Septimus v. Univ. of Hous.*, 399 F.3d 601, 610 (5th Cir. 2005) (citing *Roberson*, 373 F.3d at 654; *Rutherford v. Harris Cnty., Tex.*, 197 F.3d 173, 180 n.6 (5th Cir. 1999)).

Plaintiff also cites as evidence of discrimination two disability-related comments made by Najera and Zamudio roughly a month prior to the First Demotion. First, Zamudio tauntingly chanted "Leah looking sick" at Plaintiff in front of her fellow employees. Pl.'s Aff. ¶¶ 6, 24. Second, Najera, while staring at Plaintiff in the middle of a meeting, stated "the job is not for you if you have a health problem, you will still get demoted and you could still loose [sic] your job." *Id.* ¶ 24. However, for the reasons below, as a matter of law neither of these comments connect the First Demotion to Plaintiff's disability.

As other district courts in the Fifth Circuit have noted, the Fifth Circuit has adopted varying approaches regarding how courts should analyze whether or not workplace comments are probative of discrimination. *See, e.g.*, *Condon v. Wood Group Logging Servs.*, Civil Action No. H-06-2193, 2007 WL 2330131, at *9 (S.D. Tex. Aug. 14, 2007). Prior to the Supreme Court's decision in *Reeves*, 530 U.S. 133, the Fifth Circuit applied a four-step test to determine whether workplace comments constitute evidence of discriminatory animus. *See Brown v. CSC Logic*, 82 F.3d 651, 655 (5th Cir. 1996). To be probative under the *CSC Logic* test, the comments must be (1) disability-related; (2) proximate in time to an adverse employment action; (3) made

by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue. 82 F.3d at 655.

In *Reeves*, however, the Supreme Court chastised the Fifth Circuit for discounting comments related to the plaintiff's protected status. 530 U.S. at 153. The Fifth Circuit, in the proceedings below, had "acknowledg[ed] 'the potentially damning nature'" of the comments at issue, but nonetheless deemed them not probative of discrimination because "they 'were not made in the direct context of [the plaintiff's] termination.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 197 F.3d 688, 693 (5th Cir. 1999)). The Supreme Court held that this, combined with other instances of the Fifth Circuit "impermissibly substitut[ing] its judgment concerning the weight of the evidence for the jury's," amounted to reversible error. *Id.*

This Court must therefore determine what analytical framework applies to workplace comments post-*Reeves*. Different panels of the Fifth Circuit have reached varying conclusions regarding whether and to what extent the *CSC Logic* framework survives *Reeves*. Several panels, including the first to decide the issue post-*Reeves*, have concluded either implicitly or explicitly that *Reeves* did not wholly abrogate the *CSC Logic* four-step framework. *See Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 343-44 (5th Cir. 2002); *Methodist*, 271 F.3d at 222; *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 404-05 (5th Cir. 2001); *Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 400-01 (5th Cir. 2000). By contrast,

> [o]ther Fifth Circuit cases state that the appropriately "cautious" post-*Reeves* test is that derogatory statements can constitute evidence of discrimination even when they are not in the direct context of discrimination and even if made by one other than the formal decisionmaker, as long as the speaker is in the position to influence the decision.

*Condon*, 2007 WL 2330131, at *9 (citing *Palasota*, 342 F.3d at 576; *Laxton v. Gap, Inc.*, 333 F.3d 572, 583 (5th Cir. 2003); *Sandstad*, 309 F.3d at 899). *Accord Russell*, 235 F.3d at 225-29.

Still other panels avoid the question and "do not reach whether the *CSC Logic* approach

continues to be viable" after *Reeves*. *Sandstad*, 309 F.3d at 899 n.6. Yet others state that *CSC Logic* retains its vitality in some circumstances but not others, but these cases reach varying conclusions regarding what those circumstances are. *See Laxton*, 333 F.3d at 583 n.4 (stating that *CSC Logic* applies "when a remark is presented as direct evidence of discrimination" but not when the remark is "introduced as additional evidence of discrimination" within the *McDonnell Douglas* framework for circumstantial evidence); *Palasota*, 342 F.3d at 576-78 (applying *CSC Logic* to internal memoranda but not to remarks where remarks were "not the only evidence of pretext"); *Auguster*, 249 F.3d at 404-05 (holding that *Reeves* abrogates *CSC Logic* only in cases where the plaintiff has produced "substantial evidence of pretext" in addition to the comments at issue).

While it is not necessary to conclusively reconcile these competing approaches here, to resolve the Summary Judgment Motion the Court must at least evaluate the degree to which a comment must relate to the challenged employment decision to be probative of discrimination. The Court concludes the connection between the comment and the challenged decision is often relevant, but not alone dispositive. Because "a later panel of [the Fifth Circuit] cannot overrule an earlier panel decision," *Hill v. Carroll Cnty., Miss.*, 587 F.3d 230. 237 (citing *Harvey v. Blake*, 913 F.2d 226, 228 n.2 (5th Cir. 1990)), this Court is bound by the Fifth Circuit's first post-*Reeves* decision in *Rubinstein*, which held that workplace comments are probative if they "are related to the employment decisions at issue." 218 F.3d at 401.  However, to avoid running afoul of *Reeves*, the Court cannot discount "potentially damning" comments solely "on the ground that they 'were not made in the direct context of'" the challenged employment decision. *Reeves*, 530 U.S. at 153 (quoting *Reeves*, 197 F.3d at 693). Thus, the Court should not require a strong nexus between the comment and the challenged action when the employee has offered

other convincing evidence of discrimination, but, "where the plaintiff has failed to produce substantial evidence of pretext," an offensive comment will not create a genuine issue of material fact if it is wholly unrelated to the challenged employment action.[23] *See Auguster*, 249 F.3d at 404-05. In this way, Fifth Circuit precedent interacts with *Reeves* by creating a sliding scale: the stronger the employee's evidence of discrimination, the less connection the employee must show between the comments and the adverse employment action, and vice versa.

Given the foregoing, Zamudio's "Leah looking sick" comment is not probative of disability discrimination. Zamudio's comment was not related to any employment decision; it was merely related to Plaintiff's appearance on that day. *See*, *e.g.*, *Patel*, 298 F.3d at 343-44. The comment does not reflect a desire to demote or terminate Plaintiff or to thin Defendants' ranks of disabled employees; at worst, the comment reflects a mere desire to be rude or insensitive. *See Palasota*, 342 F.3d at 576-77. Because, as will be explained below, Plaintiff has not produced "substantial evidence of pretext," the fact that Zamudio's comment was entirely unrelated to the First Demotion entails that the comment is not probative of discrimination as a matter of law. *See Auguster*, 249 F.3d at 404-05. Zamudio's comment is exactly the sort of "stray remark" that the Fifth Circuit has deemed insufficient to demonstrate discriminatory animus, even post-*Reeves*. *See*, *e.g.*, *Rubinstein*, 218 F.3d at 400-01 (holding that offensive remarks directed at Russian Jewish employee did not demonstrate that adverse employment actions were product of discriminatory intent).

---

[23] There remains some additional confusion regarding whether and when such comments should be analyzed during *McDonnell Douglas* step one, *McDonnell Douglas* step three, or outside the *McDonnell Douglas* framework entirely. *See*, *e.g.*, *Laxton*, 333 F.3d at 583; *Auguster*, 249 F.3d at 404-05; *Russell*, 235 F.3d at 225-26; *Rubinstein*, 218 F.3d at 400-01. The Court need not resolve this question. Although the Court analyzes Zamudio and Najera's comments as part of Plaintiff's prima facie case, it would reach the same conclusions if it analyzed the comments in the context of pretext or as direct evidence, because Plaintiff's evidence is so weak. *See Auguster*, 249 F.3d at 404-05 (5th Cir. 2001).

Najera's "the job is not for you if you have a health problem, you will still get demoted and you could still loose [sic] your job" comment appears more damning than Zamudio's taunts, but even after *Reeves* an employee's remarks only demonstrate that an adverse employment action was motivated by discrimination when that employee was "involved in the employment decision of which the plaintiff complains." *Russell*, 235 F.3d at 229 (emphasis omitted) (quoting *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 652-53 (7th Cir. 2000)). There is no evidence that Najera was involved in the decision to demote Plaintiff. Plaintiff admits Defendants made the decision to demote her prior to her meeting with Najera. Pl.'s Dep. 60, 141. There is no evidence that Najera was involved in selecting the demotion criteria or who would be demoted; instead, the evidence demonstrates that Zamudio and several other managers largely unrelated to the facts of the Case were the architects of the demotion campaign. *See* Defs.' Ex. 4. *See also* Pl.'s Dep. 60 (indicating that Zamudio was the manager who made the decision to demote Plaintiff). Nor is there any evidence that Najera exercised "influence or leverage over the official decisionmaker" in the First Demotion such that it would be "proper to impute [Najera's] discriminatory attitudes to the formal decisionmaker." *Russell*, 235 F.3d at 226 (citing *Haas v. ADVO Sys., Inc.*, 168 F.3d 732, 734 n.1 (5th Cir. 1999); *Long v. Eastfield Coll.*, 88 F.3d 300, 307 (5th Cir. 1996)). All the evidence suggests that Najera was, at most, the messenger. Because there is no evidence in the summary judgment record that Najera had any "authority over the decision" to demote Plaintiff, Najera's comments are not probative of disability discrimination. *See, e.g.*, *Patel*, 298 F.3d at 344 (citing *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir. 1996)).

Thus, Plaintiff has not demonstrated that the First Demotion was motivated, even in part, by her disability. *See Pinkerton*, 529 F.3d at 519 (citing *Soledad*, 304 F.3d at 503-04). But, even if she had, Plaintiff's prima facie case would still be defective because she offers no evidence

that Defendants' demotion campaign treated disabled employees differently than non-disabled employees in nearly identical circumstances. *See Lee*, 574 F.3d at 260-62; *Wyvill*, 212 F.3d at 305. Again, Plaintiff mentions that Acosta "got really low scores" but "never got demoted." Pl.'s Aff. ¶ 25. However, Plaintiff does not allege that Acosta's combined performance and leadership scores put her below the demotion cutoff. Under Defendants' criteria, an employee could receive "really low scores" and still not be demoted as long as she was ranked above the fifth lowest coach. Delgado Decl. ¶ 3; Defs.' Ex. 4. Plaintiff therefore cannot rule out the possibility that the difference in treatment between her and Acosta was due to a neutral, non-discriminatory factor, so Acosta is not a nearly identical comparator. *See Hernandez*, 2012 WL 641033, at *10 (holding that a factfinder could not permissibly infer that employees were treated differently on the basis of race where employees could also be distinguished on the basis of other variables). Acosta's experience therefore does not demonstrate that non-disabled employees were treated more favorably. Moreover, as stated above, several other employees were demoted on the same day as Plaintiff. There is no evidence that these employees were also disabled, which further decreases the likelihood that Defendants treated non-disabled employees more favorably. Plaintiff could potentially have bolstered her case if she produced evidence that disabled employees other than her were treated less favorably, but Plaintiff could not do so. *See Armendariz*, 58 F.3d at 152-53; *Daugherty*, 56 F.3d at 700.

In sum, Plaintiff offers no evidence that the First Demotion resulted from her disability. *See Vadie v. Miss. State. Univ.*, 218 F.3d 365, 373 (5th Cir. 2000) ("All that it proves . . . is that MSU's decision-makers had some unidentifiable reason for not wanting to hire Dr. Vadie. The evidence has no probative value with respect to the ultimate question . . . of whether there was discrimination based on national origin."). Nor has Plaintiff produced evidence that she was

40

treated less favorably than non-disabled employees. Plaintiff, at bottom, offers only her belief that Defendants demoted her because of her disability, but "[Plaintiff's] belief that [Defendants'] decision was motivated by discrimination, however genuinely held," is insufficient to create an issue of fact regarding Defendants' motive. *See Septimus*, 399 F.3d at 610 (citing *Roberson*, 373 F.3d at 654; *Rutherford*, 197 F.3d at 180 n.6). *Accord Swanson*, 110 F.3d at 1186 (citing *Odom v. Frank*, 3 F.3d 839, 849 (5th Cir. 1993)). Thus, Plaintiff has failed to establish her prima facie case as to any of her discrimination claims.

### b. Plaintiff cannot demonstrate that the First Demotion was pretextual

Even if Plaintiff had established a prima facie case of ADA discrimination for the First Demotion and thereby survived *McDonnell Douglas* step one, her claim would still falter on step three. Defendants' explanation that the First Demotion was part of a broader reduction in force based on well-defined, disability-neutral criteria satisfies Defendants' burden at *McDonnell Douglas* step two to offer a legitimate, nondiscriminatory justification for the First Demotion. *See*, *e.g.*, *Armendariz*, 58 F.3d at 150 (citing *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 957-58 (5th Cir. 1993); *Hanchey v. Energas Co.*, 925 F.2d 96, 98 (5th Cir. 1990)) ("Job elimination or office consolidation is a sufficient nondiscriminatory reason . . ."); *Republic*, 924 F.2d at 96 (holding that allegations of "a reduction in workforce and poor job performance" satisfy an employer's burden at *McDonnell Douglas* step two). Plaintiff must therefore rebut Defendants' stated reason to survive summary judgment. *See*, *e.g.*, *McInnis*, 207 F.3d at 280 (citing *Daigle*, 70 F.3d at 396).

Plaintiff argues that Defendants' stated reason is pretextual because (1) Defendants purposefully made Plaintiff appear to have performed poorly so they could cloak the

41

discriminatory demotion with a neutral, performance-based justification; and (2) her performance scores were not low enough to justify demotion. Neither argument suffices to establish pretext.

First, Plaintiff argues that she was demoted in error because "Defendants consciously and deliberately caused Plaintiff to appear to have performed poorly" by "assigning [her] low-performing agents[] and [giving her] the night shift" in January 2010. Pl.'s Resp. to Proposed Undisputed Facts ¶ 3; Pl.'s Aff. ¶¶ 8, 10. Plaintiff further notes that she was not given low-performing agents to supervise until after her second hospitalization and after her co-workers began treating her unpleasantly, which leads her to believe that Defendants acted on the basis of discriminatory animus. Pl.'s Aff. ¶ 8. However, to entertain Plaintiff's assertion that Defendants sought to artificially depress her performance score would require a series of precarious inferences unsupported by evidence: (1) that Defendants assigned Plaintiff a low-performing team so they could cover up a discriminatory demotion several months down the line, long before before Zamudio and his colleagues had even formulated the demotion criteria; (2) that there was necessarily little to no chance the low-performing team would improve under Plaintiff's supervision; (3) that Plaintiff would necessarily obtain low performance scores supervising the team she was given; (4) that Plaintiff's performance score would be so adversely affected as to place her within the as-yet-unformulated demotion range; and so forth. This argument therefore amounts to nothing but unsubstantiated assertions, which are insufficient to survive summary judgment. *See Liquid Air*, 37 F.3d at 1075.

Second, Plaintiff suggests that she should not have been demoted because she was in fact one of Defendants' top-performing employees during the time period immediately preceding the First Demotion. *See* Pl.'s Aff. ¶ 8 ("I was performing at 106% and given a raise. That all changed

42

on or about April 15, 2010, when I had a doctor's appointment."). If Plaintiff produced evidence

that she was in fact not among the lowest-performing coaches at the time of the First Demotion

but was nonetheless demoted anyway, that might suggest that Defendants actually demoted

Plaintiff on the basis of disability. *See Reeves*, 530 U.S. at 147 ("In appropriate circumstances,

the trier of fact can reasonably infer from the falsity of the explanation that the employer is

dissembling to cover up a discriminatory purpose."). The problem with this argument is that it is

completely inconsistent with Plaintiff's repeated assertion that "Defendants consciously and

deliberately caused [her] to appear to have performed poorly." Pl.'s Resp. to Proposed

Undisputed Facts ¶ 3. The score Defendants assigned Plaintiff immediately prior to the First

Demotion may or may not have accurately represented her performance level, but that score

could not be remarkably high and remarkably low simultaneously. The rest of Plaintiff's own

evidence suggests the latter. *See* Pl.'s Aff. ¶ 25 (stating that Plaintiff's "work performance was

not good for the months of January, February and March" because Defendants "did not have

enough training for different skills"); *id.* (stating that Plaintiff was demoted for low scores); *id.* ¶

8 (stating that Defendants "assign[ed her] the worst-performing employees to supervise, making

it . . . impossible for [her] to be successful at work"); *id.* ¶ 10 (stating that Defendants "had

ensured that [Plaintiff's] performance would appear poor by assigning [her] low-performing

agents and [giving her] the night shift"). There is therefore no more than a mere scintilla of

evidence that Plaintiff's performance score was sufficiently high to place her outside the

demotion range, so Plaintiff cannot demonstrate pretext on this ground. *See Liquid Air*, 37 F.3d

at 1075. *Cf. Sandstad*, 309 F.3d at 899 ("Merely disputing [the employer's] assessment of [the

employee's] performance will not create an issue of fact.") (citing *Evans v. City of Houston*, 246

F.3d 344, 355 (5th Cir. 2001)).

The Court accordingly grants summary judgment to Defendants on Plaintiff's ADA discrimination claims.

### 2.      Plaintiff's wrongful termination claim under the ADA

In addition to her claim for employment discrimination, Plaintiff also brings a claim for "wrongful termination of employment" under the ADA. Pl.'s Am. Compl. ¶ 1. Just as Plaintiff's wrongful termination claim under the ADEA is duplicative of her ADEA discrimination claim, so too is Plaintiff's wrongful termination claim under the ADA duplicative of her ADA discrimination claim. *Cf. Wynes v. Kaiser Permanente Hosps.*, No. 2:10–cv–00702–MCE–GGH, 2013 WL 1284320, at *13 n.12 (E.D. Cal. Mar. 28, 2013) ("[The p]laintiff's third cause of action also contains other allegations, including . . . wrongful termination because of [the p]laintiff's disability . . . These claims appear to be duplicative to the claims alleged in [the p]laintiff's [cause of action for discrimination due to disability]."). *See also* 42 U.S.C. § 12112 (prohibiting discrimination against employees with disabilities in regard to the "discharge of employees"). In any event, Plaintiff's wrongful termination claim fails for the same reasons as her employment discrimination claim, so the Court grants summary judgment in favor of Defendants on this claim.

### D.      Plaintiff's Retaliation Claims Under Both the ADA and ADEA

Even though Plaintiff's discrimination claims fail under both the ADA and the ADEA, "[t]here is no requirement that a plaintiff must prevail on any underlying claim of intentional discrimination in order to prevail on a claim of retaliation." *Vadie*, 218 F.3d at 377 n.24. The Court therefore considers Plaintiff's retaliation claims under both of these statutes.

Plaintiff asserts three different charges of retaliation under the ADA and the ADEA against Defendants. Pl.'s Am. Compl. ¶ 1. The first is that Defendants retaliated against Plaintiff

for requesting reasonable accommodations for her disabilities. *Id*. The second is that Defendants retaliated against Plaintiff for filing complaints against Defendants with the EEOC. *Id*. The third is that Defendants retaliated against Plaintiff for filing a charge with the Department complaining of workplace discrimination. *Id*. Defendants respond that Plaintiff cannot establish a causal connection between any of these protected activities and the adverse employment actions, and that Plaintiff cannot establish that the Termination would not have occurred "but for" her protected activity. Summ. Judg. Mot. 15-17; Defs.' Reply 5-7. The court addresses each of Plaintiff's charges in turn.

Whereas the essence of a discrimination claim is the allegation that an employer has taken adverse action against an employee on the basis of that employee's status, a retaliation claim alleges that the employer has taken adverse action against the employee because that employee has undertaken some statutorily protected activity. *See, e.g.*, *McCoy*, 492 F.3d at 556-57 (comparing the elements of discrimination with the elements of retaliation). "A plaintiff establishes a prima facie case of unlawful retaliation by proving (1) that she engaged in protected activity, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action." *Sherrod v. Am. Airlines*, 132 F.3d 1112, 1122 n.8 (5th Cir. 1998) (citing *Long*, 88 F.3d at 305 n.4).

The *McDonnell-Douglas* burden-shifting analysis described above applies to Plaintiff's retaliation claims. *Feist v. State of La.*, --- F.3d ----, 2013 WL 5178846, at *3 (5th Cir. Sept. 16, 2013) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, --- U.S. ----, 133 S. Ct. 2517, 2533 (2013); *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999)). However, for the reasons described below, Plaintiff has failed to establish her prima facie case on any of her retaliation claims. The Court therefore has no occasion to proceed to *McDonnell Douglas* steps two and three. The

Court grants summary judgment for Defendants on all of Plaintiff's retaliation claims.

### 1. The protected activity element

The Court first assesses whether Plaintiff has engaged in some statutorily protected activity. *Sherrod*, 132 F.3d at 1122 n.8 (citing *Long*, 88 F.3d at 305 n.4). It is clear she has. For one, an employee may bring a retaliation claim against an employer who subjects the employee to an adverse employment action because that employee requested a reasonable accommodation under the ADA.[24] *See*, *e.g.*, *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 316 (5th Cir. 2007) (citing 42 U.S.C. § 12203(a)). Plaintiff's EEOC filings also constitute protected activities that may serve as the basis for a retaliation claim. *E.g.*, *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1092 (5th Cir. 1995). The same is true of Plaintiff's dealings with the Department. *See*, *e.g.*, *Ellis v. Knight Transp., Inc.*, No. 1:11–CV–1300 AWI MJS, 2012 WL 6554382, at *3 (E.D. Cal. Dec. 14, 2012).

### 2. The adverse employment action element

Having established that Plaintiff engaged in various protected activities, the Court considers which, if any, of Defendants' actions constitute adverse employment actions. The term "adverse employment action" is defined differently in the retaliation context than in the discrimination context. *Burlington*, 548 U.S. at 63-64, 67-69 (defining "adverse employment action" in the context of a Title VII retaliation claim); *see also Hammond v. Jacobs Field Servs.*, 499 F. App'x 377, 383 (5th Cir. 2012) (applying *Burlington* in the context of an ADA retaliation

---

[24] Note, however, that "the ADEA has no counterpart to the ADA's duty to make reasonable accommodation." Keith R. Fentonmiller & Herbert Semmel, *Where Age and Disability Discrimination Intersect: An Overview of the ADA for the ADEA Practitioner*, 10 Geo. Mason U. Civ. Rts. L.J. 227, 232-33 (2000); *accord*, *e.g.*, *McClaren v. Morrison Mgmt. Specialists, Inc.*, 316 F. Supp. 2d 489, 502 (W.D. Tex. 2004) (citing *Johnson v. Exxon Mobil Corp.*, No. 02 C 5003, 2004 WL 419897, at *5 (N.D. Ill. Feb. 2, 2004)). Because Plaintiff's accommodation requests all related to her disabilities rather than her age, the accommodation requests constitute protected activities.

case); *Peace v. Harvey*, 207 F. App'x 366, 368 (5th Cir. 2006) (applying *Burlington* in the context of an ADEA retaliation case). For the purposes of a retaliation claim, "adverse employment action" is "not limited to discriminatory actions that affect the terms and conditions of employment," and can include harm outside the workplace or actions indirectly related to final employment actions. *Burlington*, 548 U.S. at 63-64. "Adverse employment actions" amount to those actions that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id*. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). This standard is objective in the sense that it does not render actionable the sorts of "petty slights, minor annoyances, and simple lack of good manners" that a reasonable worker would deem trivial. *Id*. at 68-69. However, the standard is also partially subjective in the sense that

> [c]ontext matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed . . . [A]n act that would be immaterial in some situations is material in others.

*Id*. at 69 (citations and quotation marks omitted).

Under this standard, the only actions that definitely amount to adverse employment actions as a matter of law are the First Demotion, the Second Demotion, and the Termination. *See*, *e.g.*, *Blackwell v. Laque*, 275 F. App'x 363, 370 n.8 (5th Cir. 2008) ("[T]here is no dispute that termination constitutes an adverse employment action under any potentially applicable standard."); *Jones v. CVS Pharmacy, Inc.*, Civil Action No. 3:07-CV-1383-L, 2009 WL 1904842, at *5 (N.D. Tex. July 2, 2009) (holding that demotion and termination amount to adverse employment actions under *Burlington*). The Court also assumes, but does not decide, that (1) forcing Plaintiff to miss her doctor's appointment, Pl.'s Aff. ¶ 6, 9-10, 13, 25; (2)

47

requiring Plaintiff to sign an arbitration agreement, *id*. ¶ 32; (3) not paying Plaintiff for jury duty, *id*. ¶ 33; and (4) requiring Plaintiff to retake a certification test, *id*. ¶ 34; were, at least in the circumstances of the Case, actions that might have dissuaded Plaintiff from engaging in statutorily protected activity. *See McCoy*, 492 F.3d at 560-61.

Although giving Plaintiff undesirable shifts, teams, and assignments might constitute an adverse employment action in a different case, it is not an adverse employment action under these facts. *See* Pl.'s Aff. ¶¶ 8, 10, 29. The Supreme Court has indicated that a schedule change may only be actionable if the worker possesses traits that would make that schedule change particularly inconvenient or harmful. *See Burlington*, 548 U.S. at 69 ("A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children.") (citing *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005)). Plaintiff never alleges that her disabilities prevented her from performing adequately at her new shift; she merely states that she would have preferred a different shift. *See* Pl.'s Aff. ¶¶ 8, 29. Plaintiff's subjective preference for a different shift does not make her transfer a materially adverse action. *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 485 (5th Cir. 2008) (citing *Burlington*, 548 U.S. at 68). Likewise, shifting workloads and low-performing teams are the sorts of "'minor annoyance[s]' that all employees face from time to time," *Aryain*, 534 F.3d at 486, and are therefore not actionable. *See also Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321 (5th Cir. 2009) (holding that reassignment to new supervisor with heavier workload was not adverse employment action for purposes of retaliation claim under facts of case); *Otero v. City of Chi.*, No. 10 CV 2284, 2013 WL 530977, at *11 (N.D. Ill. Feb. 6, 2013) (employer's failure to assign employee to preferred teams did not constitute adverse employment action for purposes of retaliation claim); *Escalante v. Holder*,

48

No. EP-09-CV-368-KC, 2011 WL 1528472, at *11-12 (W.D. Tex. Apr. 20, 2011) (Cardone, J.)

(holding that temporary schedule change and additional duty assignments were not adverse

employment actions for purposes of retaliation claim).

For similar reasons, while the November 29, 2010, denial of intermittent FMLA leave

might be an adverse employment action under different facts, it was not an adverse employment

action here.[25] *See* Pl.'s Aff. ¶ 30. This Court has held that where an employer denies leave to an

employee on a few specific instances, but grants leave on numerous other occasions, the denials

cannot support a retaliation claim. *Hernandez*, 2012 WL 641033, at *12. Defendants denied

Plaintiff leave only twice: once on November 29, 2010, under circumstances Plaintiff does not

describe, and second when Defendants denied Plaintiff the two-year leave of absence requested

in the Fourth Accommodation Request. Defendants granted Plaintiff leave on numerous other

occasions, including for her multiple hospitalizations for anxiety and diverticulitis both before

and during the time frame relevant to Plaintiff's claims. *See* Defs.' Ex. 1 (providing a

documentary record of all leave that Defendants granted Plaintiff). The facts of the Case are not

relevantly distinguishable from those of *Hernandez*,[26] so the November 2010 denial of leave was

---

[25] The Court again notes that Plaintiff's assertion that she was denied leave on November 29, 2010, contradicts her sworn deposition testimony, but the Court will assume that the November 29, 2010, denial actually occurred and that Plaintiff's memory of it lapsed at her deposition. *Compare* Pl.'s Dep. 116, *with* Pl.'s Aff. ¶ 30.

[26] *Hernandez* may be distinguishable in one respect: the employer denied the employee in *Hernandez* "*official* leave time," 2012 WL 641033, at *14 (emphasis added), whereas Plaintiff alleges that Defendant denied Plaintiff's request for leave *under the FMLA*. Plaintiff's November 2010 leave request may therefore have been subject to statutory protections to which the leave request in *Hernandez* was not. However, Plaintiff does not allege that Defendants violated any statutory provision in denying her leave. *See* Pl.'s Aff. ¶ 30. *See also* Pl.'s Am. Compl. ¶ 1 (failing to include a cause of action for violation of the FMLA). Given Plaintiff's tendency, described above, to misidentify non-qualifying leave as "FMLA leave," *compare* Pl.'s Aff. ¶ 40, *and* Pl.'s Resp. to Proposed Undisputed Facts ¶ 2, *with* 29 U.S.C. § 2612(a)(1)(D), the Court does not construe the pleadings to allege a cause of action under the FMLA. Rather, the Court construes paragraph 30 of Plaintiff's Affidavit to allege only that Defendant denied Plaintiff leave that it would ordinarily be inclined but not required by law to grant, and that Defendants did so solely to retaliate against Plaintiff.

49

not an adverse employment action as a matter of law. *Accord Ogden v. Potter*, 397 F. App'x 938, 939 (5th Cir. 2010).

The remaining actions Plaintiff alleges are the sort of petty irritants that the *Burlington* Court deemed not actionable.[27] *See also Aryain*, 534 F.3d at 485 ("[R]ude treatment . . . do[es] not rise to the level of material adversity."); *King v. Louisiana*, 294 F. App'x 77, 85 (5th Cir. 2008) ("[A]llegations of unpleasant work meetings, verbal reprimands, improper work requests, and unfair treatment do not constitute actionable adverse employment actions as . . . retaliation.") (citing *Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000)).

Therefore, some, but not all, of Defendants' actions constitute adverse employment actions. The Court must evaluate whether the surviving actions are causally linked to her protected activities.

### 3. The causal link element

Plaintiff, to establish a causal link between the protected activity and the adverse employment action, must demonstrate "that the adverse employment action . . . would not have occurred 'but for' her protected conduct." *Septimus*, 399 F.3d at 608 (citing *Pineda v. UPS*, 360 F.3d 483, 487 (5th Cir. 2004)). *Accord Mayberry*, 55 F.3d at 1092 (citing *Jack v. Texaco Research Ctr.*, 743 F.2d 1129, 1131 (5th Cir. 1984)). "The timing of the adverse employment

---

[27] *See* Pl.'s Aff. ¶¶ 6, 9-13, 24, 26, 31 (lack of attention and unfriendly verbal and non-verbal communication from fellow co-workers); *id.* ¶¶ 13, 27 (requesting that Plaintiff report when she made a trip to the restroom in excess of those permitted by company policy); *id.* ¶ 16 (requesting that Plaintiff provide medical documentation to substantiate the health problems for which she was requesting accommodations); *id.* ¶ 19 (scrutinizing Plaintiff's work performance); *id.* ¶ 24 (preparing to reprimand Plaintiff but ripping up the reprimand upon realizing that Plaintiff was correctly following company policy); *id.* (delayed responses to Plaintiff's messages); *id.* ¶ 28 (requesting that Plaintiff release a call on hold); *id.* ¶ 31 (requesting that Plaintiff communicate more with other agents); *id.* ¶ 35 (insufficient help from supervisors when dealing with forty minute call); *id.* ¶ 36 (not giving Plaintiff a report card); *id.* ¶ 37 (sending an instant message of unspecified content to Plaintiff rather than to Plaintiff's supervisor).

action" in relation to the protected activity "can be a significant . . . factor" when deciding whether an employer has retaliated against its employee. *Id.* (citing *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 42 (5th Cir. 1992)). Although timing is "not necessarily determinative" in all retaliation cases summary judgment is generally proper where the protected activity is so remote from the challenged employment decisions that a jury could not conclude that the decision was causally connected to the protected activity. *See id.* (citing *Shirley*, 970 F.2d at 42). The Fifth Circuit has stated "that 'a time lapse of up to four months' may be sufficiently close" to survive summary judgment, but "a five month lapse is not close enough without other evidence of retaliation." *Feist*, 2013 WL 5178846, at *3 (quoting *Evans*, 246 F.3d at 354; citing *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 472 (5th Cir. 2002)).

### a.   Retaliation for requesting reasonable accommodation

As noted above, Plaintiff made four requests for accommodations. Plaintiff alleges that Defendants retaliated against Plaintiff for requesting each of these accommodations. However, for the reasons below, Plaintiff cannot establish a causal link between her first two requests and any adverse employment action due to insufficient temporal proximity. Plaintiff's claims based on the final two requests also fail because these accommodation requests were not reasonable, and Defendants were justified in demoting and terminating Plaintiff.

### i.   The First Accommodation Request and the Second Accommodation Request were too temporally remote from the adverse employment actions alleged

The First Demotion occurred on April 15, 2010. Pl.'s Aff. ¶ 9. Defendants caused Plaintiff to miss her doctor's appointment on the same day. *Id.* These incidents occurred nearly a year after the First Accommodation Request. *Id.* ¶ 5. In the absence of other significant evidence of retaliation, this is, as a matter of law, too long to allow the trier of fact to conclude these

adverse employment actions were causally linked to the First Accommodation Request. *See Feist*, 2013 WL 5178846, at *3 (quoting *Evans*, 246 F.3d at 354; citing *Raggs*, 278 F.3d at 472).

Likewise, the Second Demotion on June 14, 2012 and the Termination on August 23, 2012 occurred over two years after the Second Accommodation Request on May 15, 2010. Pl.'s Aff. ¶¶ 13, 17, 21-22. The January 26, 2011, arbitration agreement, the March 2011 denial of jury duty pay, and the March 16, 2011, certification test were also more than five months after the Second Accommodation Request. *Id.* ¶¶ 6, 9-10, 13, 25, 32-34. Again, this is too temporally remote to support a finding of causation. *See Feist*, 2013 WL 5178846, at *3 (quoting *Evans*, 246 F.3d at 354; citing *Raggs*, 278 F.3d at 472).

### ii.    The Third Accommodation Request and the Fourth Accommodation Request were unreasonable accommodations Defendants were not required to grant

Only the Third Accommodation Request in May or June of 2012 and the Fourth Accommodation Request in July or August 2012 were sufficiently proximate to the Second Demotion and the Termination to allow the inference that these adverse employment decisions were a consequence of Plaintiff's requests. *See LeMaire v. La. Dep't. of Transp. & Dev.*, 480 F.3d 383, 390 (5th Cir. 2007). However, as explained above, the Third Accommodation Request and the Fourth Accommodation Request were unreasonable as a matter of law. Fifth Circuit precedent establishes that, for Plaintiff to prevail on a claim that Defendants demoted or discharged her in retaliation for undertaking some protected activity, she must prove that she was qualified for the position. *Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 257, 259-61 (5th Cir. 2001). *Accord Lambus v. City of Jackson Fire Dep't*, 54 F. App'x 414, 414 (5th Cir. 2002) (applying *Holtzclaw* to retaliation claims brought under the ADA). In other words, to establish a prima facie case for retaliation, the employee must prove he or she could have performed the job

at the time he or she was terminated or demoted. *See Holtzclaw*, 255 F.3d at 257, 259-61. It is true that summary judgment on an employee's retaliation claim is improper when the employer and employee dispute whether or not the employee was qualified for the position. *See EEOC v. Dunbar Diagnostic Servs. Inc.*, 92 F. App'x 83, 85 (5th Cir. 2004). Here, however, for the reasons discussed previously, Plaintiff and Defendant agree that Plaintiff could not perform the essential functions of the OJT position at the time of the Second Demotion, and could not perform any work at all at the time of the Termination. Plaintiff was therefore not qualified for the position at the time of the challenged actions. Therefore, the Second Demotion and the Termination were not retaliatory acts; rather, they were the natural consequence of Plaintiff's inability to perform her job. *See Holtzclaw*, 255 F.3d at 257, 259-61. Accordingly, the Court grants summary judgment to Defendants on all of Plaintiff's claims of retaliation based on accommodation requests.

> **b.**    **The EEOC filings were too remote from the adverse employment actions to permit an inference of causation**

As with Plaintiff's claim of retaliation for seeking reasonable accommodations, the timing of Plaintiff's EEOC complaints compared to the timing of the adverse employment actions mandates summary judgment for Defendants on Plaintiff's EEOC retaliation claim. Plaintiff filed the First EEOC Complaint on or about June 7, 2010 and the Second EEOC Complaint on or about May 11, 2011. Pl.'s Resp. to Proposed Undisputed Facts ¶¶ 21-22. The First Demotion and the missed doctor's appointment took place before her EEOC filings, on April 15, 2010, Pl.'s Aff. ¶¶ 9-10, and therefore could not possibly have been the product of retaliation. *See Schroeder v. Greater New Orleans Fed. Credit Union*, 664 F.3d 1016, 1025 (5th Cir. 2011). The Second Demotion occurred on June 14, 2012, Pl.'s Aff. ¶ 17, and the

Termination occurred on August 23, 2012, *Id.* ¶ 21. These are both over a year after the Second

EEOC Complaint. As a matter of law, this is too temporally remote to allow a jury to find the

requisite causal connection in the absence of other evidence that would allow an inference of

retaliation. *See Feist*, 2013 WL 5178846, at *3 (quoting *Evans*, 246 F.3d at 354; citing *Raggs*,

278 F.3d at 472). Finally, the January 26, 2011 arbitration agreement, the March 2011 denial of

jury duty pay, and the March 16, 2011 certification test occurred over five months after the First

EEOC Complaint and before the Second EEOC Complaint. Pl.'s Aff. ¶¶ 6, 9-10, 13, 25, 32-34.

Again, this, without more, is as a matter of law too long to permit a finding of causation. *See*

*Feist*, 2013 WL 5178846, at *3 (quoting *Evans*, 246 F.3d at 354; citing *Raggs*, 278 F.3d at 472).

These adverse employment actions were therefore not causally linked to protected activity. Thus,

insofar as Plaintiff raises a retaliation claim predicated upon filing a complaint with the EEOC,

the Court grants summary judgment in favor of Defendants.

### c.      Retaliation for filing complaint with the Department

Plaintiff provides contradictory assertions regarding whether she did in fact file a

complaint with the Department. *Compare* Pl.'s Aff. ¶ 12 ("Ultimately, I did not actually file the

charge of discrimination with the [Department]"), *with id*. ¶ 13 ("I then filed a charge with the

[Department] on or about May 13, 2010."). Even assuming that Plaintiff filed a charge with the

Department or at least took steps to do so around May 13, 2010, Plaintiff's retaliation claim

based on this charge nevertheless fails for multiple reasons.

First, Plaintiff has not provided any evidence that would allow a trier of fact to conclude

that Defendants had knowledge of the charge. "In order to establish the causal link between the

protected conduct and the illegal employment action as required by the prima facie case, the

evidence must show that the employer's decision to terminate was based in part on knowledge of

the employee's protected activity." *Sherrod*, 132 F.3d at 1122. *Accord Lee*, 574 F.3d at 258; *Mayberry*, 55 F.3d at 1092. Plaintiff admits that Defendants had no knowledge that she contacted the Department. Pl.'s Dep. 142 ("Q. So [Defendants] didn't know that you had went to the [Department] . . . A. Right."). Without demonstrating knowledge, Plaintiff cannot survive summary judgment. *See Lee*, 574 F.3d at 258; *Sherrod*, 132 F.3d at 1122; *Mayberry*, 55 F.3d at 1092.

Additionally, Plaintiff's retaliation claim based on her visit to the Department suffers from the same temporal defects as her EEOC filing retaliation claim. The First Demotion occurred prior to filing the charge with the Department and therefore could not have been the product of retaliation. *Compare* Pl.'s Aff. ¶¶ 9-10 *with, id.* ¶ 13. The Second Demotion and Termination occurred over two years after Plaintiff took steps to file her charge, and the arbitration agreement, jury duty, and certification test occurred over five months after Plaintiff's dealings with the Department. *Compare id.* ¶¶ 17, 21 *with, id.* ¶ 13. Again, as a matter of law, this is too temporally remote to support a claim of retaliation absent other evidence.

Thus, insofar as Plaintiff raises a retaliation claim predicated upon filing a charge with the Department, the Court grants summary judgment in favor of Defendants.

### E.     Plaintiff's Hostile Work Environment Claim

Plaintiff does not list a cause of action for hostile work environment in the paragraph of her Amended Complaint that sets forth her claims against Defendants. Pl.'s Am. Compl. ¶ 1. However, Plaintiff uses the phrase "hostile work environment" and variations thereof on several occasions in the Amended Complaint. *Id.* ¶¶ 15, 22, 31-32, 36. Because the Amended Complaint gave notice to Defendants of a potential hostile work environment cause of action, and because Defendants had an opportunity to – and did – address the merits of Plaintiff's hostile work

environment claim, *see* Defs.' Reply at 7-9, the Court will construe the Amended Complaint to raise a hostile work environment cause of action under both the ADA and the ADEA. However, Plaintiff's hostile work environment claim ultimately fails because Defendants' alleged actions were neither severe nor pervasive, and Plaintiff cannot demonstrate that the actions were based on her age or disability.

The purpose of allowing an employee to bring a hostile work environment claim "is to level the playing field for [employees belonging to traditionally disadvantaged groups] by preventing others from impairing their ability to compete on an equal basis with" those who have not been historically disadvantaged. *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591 (5th Cir. 1995). A plaintiff may bring a hostile work environment claim under the ADEA and/or the ADA. *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 441 (5th Cir. 2011) ("We now hold that a plaintiff's hostile work environment claim based on age discrimination under the ADEA may be advanced in this court."); *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235 (5th Cir. 2001) ("[W]e find that a cause of action for disability-based harassment is viable under the ADA[.]"). To establish a hostile work environment claim, Plaintiff must demonstrate: (1) she belongs to a protected group under the ADA and/or ADEA – that is, that she is over the age of 40 and/or has a disability; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on her disability and/or age; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) Defendants knew of should have known of the harassment and failed to take prompt, remedial action. *Flowers*, 247 F.3d at 235-36 (citing *McConathy*, 131 F.3d at 563).

"The legal standard for workplace harassment in this circuit is . . . high." *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 509 (5th Cir. 2003). The "harassment must 'be

sufficiently pervasive or severe[28] to alter the conditions of employment and create an abusive

working environment.'" *Flowers*, 247 F.3d at 235-36 (quoting *McConathy*, 131 F.3d at 563).

This means that

> a plaintiff must demonstrate that the harassment was objectively unreasonable . . .
> A workplace environment is hostile when it is permeated with discriminatory
> intimidation, ridicule, and insult, that is sufficiently pervasive to alter the
> conditions of the victim's employment . . . Moreover, the complained-of conduct
> must be both objectively and subjectively offensive . . . This means that not only
> must a plaintiff perceive the environment to be hostile, but it must appear hostile
> or abusive to a reasonable person . . . To determine whether conduct is objectively
> offensive, the totality of the circumstances is considered, including: (1) the
> frequency of the discriminatory conduct; (2) its severity; (3) whether it is
> physically threatening or humiliating, or merely an offensive utterance; and (4)
> whether it interferes with an employee's work performance.

*Dediol*, 655 F.3d at 441 (citations and internal quotation marks omitted).

To determine whether harassment is pervasive or severe within the meaning of the ADA

and/or the ADEA, the Court may take guidance from hostile work environment cases in other

contexts, such as cases involving alleged race or sex harassment. *See Gowesky*, 321 F.3d at 510;

*McConathy*, 131 F.3d at 563.

### 1.     Plaintiff does not allege behavior that was pervasive or severe

Plaintiff's hostile work environment claim falters on this element. Surely, Plaintiff found

her co-workers' behavior subjectively hostile, as evidenced by her declining mental health and

the fact that Defendants' actions interfered with Plaintiff's work performance. *See Dediol*, 655

F.3d at 441. However, Plaintiff fails to allege behavior that would disturb "a reasonable person in

---

[28] The severe or pervasive element is disjunctive, not conjunctive; an allegation of behavior that
was severe but not pervasive, or pervasive but not severe, can still be sufficient to support a hostile
environment claim. *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434-35 (5th Cir. 2005)
(citations omitted). The test may be described as a sliding scale; the more egregious the conduct,
the less frequent the conduct needs to be to give rise to liability, and vice versa. *El-Hakem v. BJY
Inc.*, 415 F.3d 1068, 1073 (9th Cir. 2005); *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th
Cir. 2002). However, as will be explained below, the conduct Plaintiff alleges was neither
pervasive nor severe.

[P]laintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

For one, Plaintiff does not allege that she was physically threatened or that Defendants' employees made inappropriate physical contact with her. *See Dediol*, 655 F.3d at 443 (physical threats); *Harvill*, 433 F.3d at 435-36 (unwanted touching); *Flowers*, 247 F.3d at 237 (physically removing a tape recorder from plaintiff's pocket without permission). Additionally, other than the single isolated occasion where Zamudio commented "Leah looking sick," Defendants' employees did not direct insulting or foul language at Plaintiff. *See, e.g.*, *Dediol*, 655 F.3d at 443-44; *Flowers*, 247 F.3d at 237. Nor did Defendants' employees make rude comments explicitly relating to age or disability, again with the single exceptions of Zamudio's "Leah looking sick" taunt and Najera's comment about employees' health problems. *See EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 401 (5th Cir. 2007) (describing rude comments explicitly relating to the plaintiff's religion and national origin). Moreover, those few comments that do relate to disability fall into the category of occasional teasing, offhand comments, and non-serious isolated incidents that are not actionable. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citing *Oncale*, 523 U.S. at 82). *See also Long*, 88 F.3d at 309 (holding that isolated off-color jokes will not support a hostile work environment claim).

Many of the incidents Plaintiff alleges are trivial annoyances that would not disturb an average person in similar circumstances, such as when a human resources representative "instant-messaged" Plaintiff directly, or when Defendants failed to give Plaintiff a report card. *See Faragher*, 524 U.S. at 788 (citing *Oncale*, 523 U.S. at 80). Plaintiff makes much of the dirty looks, shunning, and ostracism from her co-workers, but as a matter of law this does not create a hostile work environment unless it is accompanied by more severe or pervasive harassment

58

activity. *See*, *e.g.*, *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005) (citations omitted); *Palesch v. Mo. Comm'n on Human Rights*, 233 F.3d 560, 567 (8th Cir. 2000). *But see Waldo v. Consumers Energy Co.*, 726 F.3d 802, 818 (6th Cir. 2013) (citations omitted). "It is a simple fact that in a workplace, some workers will not get along with one another, and this Court will not elevate a few harsh words or 'cold-shouldering' to the level of an actionable offense." *McConathy*, 131 F.3d at 564.

A few of the incidents Plaintiff alleges are more disturbing, such as forcing Plaintiff to miss her doctor's appointment, giving Plaintiff undesirable shifts and teams, and so forth. However, courts have decided that even the more concerning incidents of which Plaintiff complains, including "an arbitrary reprimand, exclusion from office activities, assignment to a[n undesirable shift] and lack of supervisor support," are "tolerable" as matter of law. *See Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873 (7th Cir. 1999) (citing *Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 705 (7th Cir. 1993)). Likewise, if, as is true under Fifth Circuit precedent, an employer does not create a hostile work environment by causing an employee to defer necessary surgery, then Defendant did not create a hostile work environment by causing Plaintiff to defer a mere doctor's appointment. *See McConathy*, 131 F.3d at 561-62, 563-64.

Plaintiff complains about how Defendants reacted begrudgingly to her need to use the restroom more frequently, *see* Pl.'s Dep. 118, 120, 142, but Defendants' reaction to Plaintiff's restroom use also did not contribute to a hostile work environment. Plaintiff admits that Defendants allowed Plaintiff to make restroom trips as necessary and did not discipline her for using the restroom. *Id*. at 27. *Cf. Robertson v. Trustees of Columbia Univ. in the City of N.Y.*, No. 08 Civ.1913(LAP), 2009 WL 3425647, at *8 (S.D.N.Y. Oct. 20, 2009) (holding that employee could not establish wrongful termination or failure to accommodate claims under ADA where

employer required employee to inform co-workers before using restroom but did not prevent employee from using restroom more often than other employees). Requiring Plaintiff to inform her co-workers when she left to use the restroom also did not create a hostile work environment. *See Rogers v. Potter*, No. C 08–2897 SBA, 2010 WL 1608867, at *4, *6-7 (N.D. Cal. Apr. 20, 2010) (holding that, *inter alia*, requiring plaintiff "to first obtain permission from his supervisors before going to the restroom" did not create a hostile work environment). Defendants' requirement that Plaintiff inform her co-workers when she was leaving was reasonable given Defendants' legitimate business need to ensure that at least one employee was always present to tend to customers. *Cf. Gowesky*, 321 F.3d at 510 (holding that conditions placed upon an employee's return to work that were calculated to prevent employee from transmitting a communicable disease to patients did not amount to hostile work environment).

Additionally, most of the incidents alleged were distant in time – often a month or more apart – which precludes a finding that her work environment was made pervasively hostile by frequent occurrences of undesirable behavior. *See Dediol*, 655 F.3d at 443 (describing "a pattern of name-calling of a half-dozen times daily"); *WC&M*, 496 F.3d at 396, 398 (racist comments multiple times a day until the date of plaintiff's termination); *Harvill*, 433 F.3d at 435 (almost weekly unwanted touching).

Thus, as a matter of law, the pattern of conduct Plaintiff alleges was neither pervasive nor severe.

### 2. Plaintiff cannot establish a link between her work environment and her age/disability

But, most importantly, and most fatal to Plaintiff's claim, a hostile work environment is only actionable under the ADEA/ADA if it was *based on her age or disability*. *Dediol*, 655 F.3d

60

at 441; *Flowers*, 247 F.3d at 235. The hostile work environment cause of action is not intended

to create a "general civility code" that prohibits any and all workplace interactions that a worker

could find rude or discourteous. *Faragher*, 524 U.S. at 787-788 (citing *Oncale*, 523 U.S. at 80).

Rather, it is intended to protect classes of workers who have historically been treated unequally

in the workplace. *See Flowers*, 247 F.3d at 233-34; *DeAngelis*, 51 F.3d at 593. Merely treating

Plaintiff poorly does not give rise to liability under these statutes; only treating Plaintiff poorly

on the basis of age/disability does. *See*, *e.g.*, *Hardin v. Christus Health S.E. Texas St. Elizabeth*,

No. 1:10-CV-596, 2012 WL 760642, at *12 (E.D. Tex. Jan. 6, 2012) (citing *Dediol*, 655 F.3d at

441). The bulk of the incidents of which Plaintiff complains have no necessary link to her age or

disability, and Plaintiff does not explain how they were motivated by her age or disability.[29] *See*,

*e.g.*, *WC&M*, 496 F.3d at 396-97 (alleging employer misbehavior obviously related to plaintiff's

race). She merely states, in a conclusory fashion, that Defendants acted upon discriminatory

animus. *See* Pl.'s Aff. ¶¶ 28-38. This is insufficient to establish the requisite causal nexus

between Plaintiff's age/disability her work environment. *See*, *e.g.*, *Palesch*, 233 F.3d at 567

("Palesch failed to provide anything more than bare allegations that her co-workers harassed her

because of her race or gender.").

   To be sure, a few of the incidents – most notably avoiding physical contact with Plaintiff,

causing Plaintiff to miss her doctor's appointment, and the "Leah looking sick" comment[30] – do

---

[29] *See*, *e.g.*, Pl.'s Aff. ¶ 24 ("On or about March 2010, my paycheck was incorrect, and when I
approached [Najera] about the discrepancy, he said to me in a rude way that he would look at it
after he ate."); *id.* ("I was having a conversation with co-worker [sic], making plans about work
and Jorge Najera rudely interrupted our conversation saying such plans will not happen."); *id.* ¶ 28
("I received orders from supervisor Thomas Gilbert to release a call, due to the call being on hold
for two minutes."); *id.* ¶ 35 ("I got stuck with a forty minute call and did not receive any help from
any supervisors.").

[30] Other adverse actions directly traceable to Plaintiff's disability include the Second Demotion
and the Termination. For the reasons described above, however, these do not give rise to liability.

61

facially relate to Plaintiff's status. When these few incidents are considered standing alone, however, they are too minor and too infrequent to amount to a pervasive or severe pattern of disability harassment. *See McConathy*, 131 F.3d at 561-62, 563-64 (holding that employer did not create hostile work environment when supervisor (1) told employee he would "no longer tolerate her health problems;" (2) ordered employee to take a business trip while still recovering from painful surgery; and (3) caused employee to defer necessary surgery).

It is true that a finder of fact, when considering a harassing act that in isolation appears age- or disability-neutral, may nonetheless infer that the act was motivated by discriminatory animus when the act occurs within a pattern of explicit and frequent age- or disability-related harassment.[31] *See WC&M*, 496 F.3d at 397-99. Again, however, the overtly age- and disability-related adverse actions Plaintiff alleges were not sufficiently severe, frequent, explicit, or pervasive to allow a factfinder to reasonably conclude that the facially age- and disability-neutral adverse actions were in fact motivated by discrimination.

For these reasons, the Court therefore grants summary judgment for Defendants on Plaintiff's hostile work environment claim.

### F.     The Motion for Sanctions

---

[31] *WC&M* is instructive regarding when the factfinder may permissibly infer discriminatory animus from facially neutral activities:

> On October 26, 2002, [finance manager] Argabrite "banged" on the partition separating [Title VII plaintiff] Rafiq's office space from the sales floor, and said to Rafiq, "Got you . . ." [W]e disagree with the district court that th[is incident] could not be considered an incident of harassment based on religion or national origin . . . Here, although Argabrite did not specifically refer to Rafiq's religion or national origin during the incident, considering the context of Argabrite's pattern of [daily] harassment based explicitly on religion and national origin, coupled with his practice of banging on the glass partition to allegedly startle Rafiq, a factfinder could easily infer that Argabrite's actions . . . were also taken on account of Rafiq's religion and national origin.

496 F.3d at 397-99.

Plaintiff claims that Defendants violated Local Rule CV-88 and Federal Rule of Civil

Procedure 16(f) by arriving at a September 24, 2013, mediation without previously obtaining

settlement authority and without making a settlement offer. Mot. for Sanctions 1-5. The Court

assumes *arguendo* that Plaintiff's account of the mediation is accurate.[32] Plaintiff accordingly

requests that this Court sanction Defendants and their counsel to compensate Plaintiff and her

counsel for their expenses incurred in preparing for the mediation, as well as for any other relief

the Court deems appropriate. *Id*. 5. For the following reasons, the Court denies the Motion for

Sanctions.

Federal Rule of Civil Procedure 16(f) allows the Court to impose sanctions against a

party that "is substantially unprepared to participate – or does not participate in good faith – in" a

pretrial conference. Fed. R. Civ. P. 16(f)(1)(B). Local Rule CV-88 establishes procedures

governing alternative dispute resolution in cases in this district, and section (j) of that Rule

provides that "[t]he sanctions available under Federal Rule of Civil Procedure 16(f) shall apply

to any violation of this rule."

The decision to impose sanctions under Federal Rule of Civil Procedure 16(f) – and, by

extension, Local Rule CV-88(j) – is entrusted to the Court's broad discretion, as is the decision

regarding the amount and type of sanctions to impose. *John v. State of La.*, 899 F.2d 1441, 1448

(5th Cir. 1990) ("Rule 16(f) gives the trial court wide authority to impose effective sanctions . .

."). *But see SEC v. First Hous. Capital Res. Fund, Inc.*, 979 F.2d 380, 381-83 (5th Cir. 1992)

(limiting the court's discretion to impose the sanction of dismissal against plaintiffs).

The Court opts not to impose sanctions in the Case. As illustrated above, all of Plaintiff's

---

[32] The Court does not decide whether the Motion for Sanctions includes confidential communications made during mediation in violation of Local Rule CV-88(h), as Defendants argue. *See* Defs.' Resp. to Mot. for Sanctions 6-8.

claims lack merit as a matter of law. As a result, the Court does not believe that the mediation would have proceeded any differently if Defendants had arrived with settlement authority because Plaintiff's claims had no chance of success and consequently had little to no monetary value. In any event, Plaintiff does not allege conduct egregious enough to warrant sanctions. The Motion for Sanctions is therefore denied.

## III.   CONCLUSION

It is therefore **ORDERED** that the Summary Judgment Motion is **GRANTED**.

**IT IS FURTHER ORDERED** that the Motion to Strike is **DENIED** as moot.

**IT IS FURTHER ORDERED** that the Motion for Sanctions is **DENIED**.

**SO ORDERED**.

**SIGNED this 30th  day of October, 2013.**

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE